2021 IL App (1st) 180765-U

No. 1-18-0765

Second Division
March 9, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 16 CR 3224 |
| v. | ) | |
| | ) | |
| CARLOS PEREZ, | ) | Honorable |
| | ) | Joel L. Greenblatt |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*: Defendant's convictions for predatory criminal sexual assault of a child are affirmed where: there was sufficient evidence to support the convictions; the trial court did not err in admitting a video-recorded statement of the victim; there was no error in the prosecutorial remarks during opening and closing statements; and the trial court did not err in instructing the jury.

¶ 2     Following a 2017 jury trial, defendant-appellant, Carlos Perez, was found guilty on four counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and

sentenced to a total of 24 years' imprisonment. On direct appeal, defendant argues that: (1) the State failed to prove each offense beyond a reasonable doubt; (2) the trial court erred in admitting the victim's video-recorded statement; (3) the prosecutor made inappropriate remarks during opening and closing statements that prejudiced defendant; and (4) the trial court erred in instructing the jury. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On March 3, 2016, a corrected indictment charged defendant with six counts of predatory criminal sexual assault of a child and six counts of aggravated criminal sexual abuse based on events that allegedly occurred when defendant was over 17 years old and his stepdaughter, A.C., was under 13 years old.[1] Prior to trial, the State *nolle pross*ed the six counts of aggravated criminal sexual abuse. In regard to the remaining counts, the indictment alleged that defendant committed various acts of sexual penetration against A.C. in that he inserted his finger into A.C.'s vagina on the following dates: August 17-31, 2015 (count I); September 1-30, 2015 (count II); October 1-31, 2015 (count III); November 1-30, 2015 (count IV); December 1-31, 2015 (count V); and January 1-29, 2016 (count VI).

¶ 5                                A. Section 115-10 Hearing

¶ 6      On December 9, 2016, the State filed a pretrial motion to admit A.C.'s video-recorded statement pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2016)). At a hearing on the motion, the State presented A.C.'s video-recorded statement and live testimony from the forensic interviewer, Christina Ayala.

---

[1] A.C. was born on September 3, 2003.

¶ 7    Ayala testified that on February 2, 2016, she was employed as the program supervisor and forensic interviewer at the Children's Advocacy Center of North and Northwest Cook County (CAC). On that date, she interviewed A.C., who was then 12 years old, in an interview room. No other individuals were in the room, though Detective Eric Pagels and Glenn Adams from the Illinois Department of Children and Family Services observed from behind a two-way mirror. After establishing a rapport with A.C., Ayala set out the "rules" for the interview: (1) if A.C. does not know the answer to a question, she should say "I don't know"; (2) if A.C. does not understand a question, she should tell Ayala; and (3) Ayala explained the difference between the truth and a lie. A.C. promised to tell Ayala the truth. The interview lasted approximately one hour.

¶ 8    Our review of the interview is reflected as follows. A.C. stated that she is currently staying at her grandmother's house with her mother and sister. Prior to her outcry to the police, she lived with her mother, sister, and defendant in Streamwood, Illinois. She stated that she knew she was there to talk about defendant and some things that started happening last year. She stated that defendant was always kind to her but would touch her body parts when her mother was not present.

¶ 9    Ayala asked her about the first time defendant touched her inappropriately, which A.C. believed was in either February or March of 2015. A.C. said that she and defendant were in her parents' bedroom when he tickled her and put his hand under her shirt to touch the "top part of her body" or "chest area." She stated that defendant put his hand on top of her bra. Ayala showed her an anatomical diagram of a girl's body, which we have included below, and A.C. circled the chest as the area where defendant touched her.



¶ 10     At first, she thought it was an accident and would not happen again. However, it started happening more frequently at the beginning of the school year. A.C. said that defendant started a new job in July 2015 and would sometimes be home when she returned from school. When she got home around 2:30 p.m., he would call her into his bedroom, tell her to lay down on the bed, and they would talk about school. She stated that he laid down on top of her, unbuttoned her pants, and started feeling around her "bottom part" or "lower area" underneath her underwear. When asked for specifics, A.C. said that she did not want to say it. She said that she did not know what to do and she just let it happen. A.C. circled on the diagram the vaginal area as what she meant by "lower area," as can be seen on the diagram above. She stated that this was the area from which she urinated. She stated that he was rubbing her lower area with his fingers underneath her

underwear. Ayala asked if his fingers ever went inside the line on the diagram and A.C. said no. She stated that the first time this occurred was around the second or third week of school. During this time, he also would kiss her, and he would try to put his tongue in her mouth. She stated that his clothes never came off and she never touched any of his private parts. She said it would stop when she would say she had to go to the bathroom or do her homework. A.C. stated that this occurred more than once and that it happened a couple times a week.

¶ 11 She then described the most recent time that this happened with defendant, about two or three weeks ago. He touched her "chest" and "lower area" and kissed her on the mouth. She stated that he touched the skin of her chest and her lower area. A.C. believed defendant was drunk at this time.

¶ 12 A.C. never told her mother about these incidents because she was scared but told a couple of her friends from school. She stated that on January 29, which was a few days prior to the interview, she told her friend, Daniella, and Daniella called the police. A.C. called her mother and revealed that defendant had been touching her in places that he "wasn't supposed to." The police then took A.C. and Daniella to the police station and A.C.'s mom picked her up from there.

¶ 13 Ayala left for a few minutes. When she returned, she asked A.C. if defendant ever kissed any other part of her body. A.C. stated that he kissed her on her neck "a lot" and "like two times a week." Ayala asked if defendant told her not to tell anyone about what he was doing, and A.C. responded no. She asked if he ever tried "to touch the line or even a little bit inside of the line of her lower area," and A.C. responded yes. She stated that the most recent time she could recall "he tried to kind of like put his finger kind of like more into it *** like more into the lower area" and she would cross her legs to stop him. She said that he tried to put his finger inside the line more than once, but she did not remember exactly when. She said that this happened "probably a couple

times a month." When Ayala asked if he ever was able "to get his finger even just a little bit inside the line," A.C. responded "yeah a little bit" and this started happening around "October-ish *** of 2015." She said that "he actually like put his finger in a little bit *** probably once like every other week" until the most recent time in January 2016.

¶ 14    A.C. stated that no one told her what to say during the interview and her mother and grandmother just told her to tell the truth.

¶ 15    The trial court allowed the State to introduce the video-recorded statement at trial. In so ruling, the court stated that the interview was reliable and that A.C.'s reticence to name specific body parts was "age appropriate for a child of such tender years" and that her repetition of the events was consistent.

¶ 16                                B. Jury Trial

¶ 17    At the beginning of the trial, the court admonished the jury, *inter alia*, that opening statements are not evidence and should not be considered as such.

¶ 18    As relevant to our analysis, the prosecutor stated the following during opening statement:

> "Ladies and gentlemen, you will hear how in the beginning, the defendant was testing his limits with [A.C.]. He would touch her breasts, he would kiss her, he would touch her vaginal area. And you will hear that as time progressed the defendant became bolder and bolder. Each time touching her further. You will hear how touching her vaginal area turned into putting his finger into her vagina. You will hear how each time he touched her, he would insert his finger more and more into her vagina and this didn't happen one time, two times, three times. It happened a lot of times."

¶ 19    A.C. testified that when she was 12 years old, she lived in Streamwood with her mother, her sister, and defendant, her stepfather. The prosecutor showed A.C. the same diagram that was

used during the forensic interview and asked her to circle the "vaginal area," which A.C. did. When asked if defendant ever touched her in a way that made her uncomfortable, A.C. responded "I don't know." She denied that defendant ever kissed her or touched her. She was shown a diagram of a girl's body and identified what she considered to be the "lower area." She testified that she lied about everything she told Ayala in the interview.

¶ 20 On cross-examination, A.C. repeated her denials that defendant abused her. She testified that after the day of the interview she never had contact with defendant again. When asked if she told "the State" that she lied, she responded "yes" and then "almost last year when [she] asked [her] mom if she could tell her this case could be over."

¶ 21 Ayala testified consistently with her testimony in the section 115-10 hearing, including the fact that she interviewed A.C. on February 2, 2016. The State published the video of the interview to the jury during Ayala's testimony.

¶ 22 Streamwood police officer Garrick Yurgil testified that on January 29, 2016, he was dispatched to the intersection of Oltendorf Road and Maxon Lane, where he met with A.C. and her friend, Daniella. He accompanied both of them to the police station, where he spoke with them and contacted their mothers. He also notified the commander of the investigations unit and Jillian Waterford from the Department of Children and Family Services. He spoke with A.C.'s mother when she arrived at the station.

¶ 23 Detective Eric Pagels testified that on February 1, 2016, he was assigned to a criminal sexual assault investigation. He attended A.C.'s forensic interview on February 2 and spoke with defendant at the Streamwood Police Department on February 3. Another detective was also in the interview room with him. Detective Pagels advised defendant of his *Miranda* rights orally and defendant also read them on the waiver form, which he signed. The interview was conducted in

English. Detective Pagels testified that he understood everything that defendant said to him and at no point did defendant appear not to understand anything Detective Pagels said.

¶ 24     According to Detective Pagels, during the interview, defendant stated that his relationship with A.C. was very good and that he loved her and cared for her very much. Defendant also stated that he would joke around with A.C. and on several occasions he would tickle her. One time when he was tickling her, A.C. leaned back, and he grabbed her breast. He told the detectives that he spoke with A.C. about her schooling or his job in his room while she laid on the bed. Defendant stated that he may have accidentally touched her breast when he was tickling her. He told the detectives that he was drunk on many occasions and he may not have known what he had done. He also told them that one time he woke up and his hand was underneath A.C.'s pants and underwear, at which time he removed his hand and apologized to her. When asked if he ever put his fingers inside A.C.'s vagina, he said no and that he was just rubbing and touching. He also apologized for the damage he caused to A.C. On cross-examination, Detective Pagels testified that he asked defendant if he was comfortable conducting the interview in English, to which defendant answered "yes."

¶ 25     After the prosecution rested, the defense moved for acquittal, which the court denied.

¶ 26     The defense called Patricia Rodriguez, who testified that she had been married to defendant for four years. She stated that she has not been in contact with the police or the prosecution prior to trial, and she has not had contact with defendant since February 2016. She denied wanting to be in contact with defendant and stated that she had not filed for divorce. When asked three times if A.C.'s life has changed since this report of sexual abuse was made, Rodriquez responded each time that A.C. told her "it didn't happen."

¶ 27    Defendant, who was 33 years old at the time of trial, testified that in February 2016, he lived with Rodriguez, their daughter, and A.C. in Streamwood. He denied touching A.C. on her breast or her vagina; kissing her; or inserting his fingers into her vagina.

¶ 28    Defendant also testified that in February 2016 his English was "[n]ot very good." He told the detectives that he did not speak English well and requested a Spanish interpreter but did not receive one. He did not understand that he was waiving his *Miranda* rights, only that the form stated his rights. When the detectives told him that he was accused of touching A.C. inappropriately, he denied it. He also  asked to make a phone call but was denied. He stated that he made those statements to the detectives because he was "[u]nder a lot of pressure" and he was "scared."

¶ 29    Prior to closing statements, the court again informed the jury that closing statements should not be considered as evidence. As relevant here, the prosecutor made the following statements:

"This defendant did this to [A.C.], took advantage of her youth as a 12-year-old girl. So what happened in this case with defendant when he was alone with [A.C.], this 12-year-old girl, touched her inappropriately. He touched her breasts. He touched her vagina. He inserted his finger into her vagina.

* * *

The defendant gave a statement to the police about what happened. He gave a pretty detailed statement about what happened and circumstances around what happened; but in the end, what he told the police was that he put his finger into her vagina. Maybe he was drunk. Maybe it was an accident, but he did it; and there is no accident in putting your finger into someone's vagina and being drunk is no excuse. Think about it.

* * *

Ladies and gentlemen, we submit to you that he did commit these acts every month when [A.C.] started 6th grade, every month. You heard it from his own statement to the police that he did it. So when you consider the verdict forms, that's why it's separating the separate time periods because he's charged for each and every separate time that he did this to her because it is a separate act. It is a separate violation of her each time he put his finger into her vagina."

¶ 30    At the jury instruction conference, the State proposed to instruct the jury in accordance with Illinois Pattern Jury Instructions, Criminal, No. 26.01 (4th ed. 2000) (hereinafter IPI 26.01) that:

"The defendant is charged in different ways with the offense of Predatory Criminal Sexual Assault. You will receive two forms of verdict pertaining to each particular way that the offense of Predatory Criminal Sexual Assault is charged. As to each particular way the offense of Predatory Criminal Sexual Assault is charged, you will be provided with both a 'not guilty' and 'guilty' form of verdict. From these two verdict forms as to each particular way that the offense of Predatory Criminal Sexual Assault is charged, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one verdict form as to each particular way that the offense of Predatory Criminal Sexual Assault is charged."

The instruction was given without objection.

¶ 31    The jury found defendant guilty of four counts and not guilty of two counts of predatory sexual criminal assault, which contained allegations occurring in the months of August and September.

¶ 32    Defendant moved for a new trial, which the trial court denied. The court sentenced defendant to six years on each count for a total of 24 years' imprisonment. Defendant now appeals.

¶ 33                                    II. ANALYSIS

¶ 34                            A. Sufficiency of the Evidence

¶ 35    Defendant first argues that the State failed to prove him guilty of each count of predatory criminal sexual assault. Specifically, he claims that there was no evidence of sufficient specificity for the incidents of sexual penetration, no corroborating evidence of sexual penetration, and A.C.'s video-recorded statement lacked reliability as she recanted her statements to Ayala at trial.

¶ 36    When a defendant challenges the sufficiency of the evidence against him, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins,* 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not this court's role to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the factfinder's role to evaluate the testimony and resolve any conflicts or inconsistencies in the testimony. *Id.* at 261-62. However, "[r]easonable people may on occasion act unreasonably" and thus, a factfinder's decision is entitled to deference but is neither conclusive nor binding. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 37    The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. To sustain a conviction for predatory criminal sexual assault of a child, the State must establish beyond a reasonable doubt that defendant, who was 17 years of

age or older, committed an act of sexual penetration upon the victim, who was younger than 13 years old. 720 ILCS 5/12-14.1(a)(1) (West 2016). "Sexual penetration" means any contact, however slight, of any body part of one person into the sex organ or anus of another person. 720 ILCS 5/11-0.1 (West 2016). Evidence is sufficient to support a conviction of predatory criminal sexual assault of a minor if the child can describe (1) the kind of acts committed with sufficient specificity, (2) the number of acts committed with sufficient specificity, and (3) the time period in which the acts occurred generally. *People v. Letcher*, 386 Ill. App. 3d 327, 334 (2008).

¶ 38    It is undisputed that defendant was over 17 years old and that A.C. was under 13 years old at the time relevant to the charged offenses. The issues before us then are whether there was sufficient evidence that sexual penetration, as defined by the statute, occurred and whether the timeframes indicated on the jury verdict forms were sufficient and supported by the evidence.

¶ 39    Here, based on the charges, to sustain its burden the State was required to prove "actual contact" between defendant's finger and A.C.'s sex organ. *People v. Finley*, 178 Ill. App. 3d 301, 307 (1988). Defendant argues that A.C.'s language was too ambiguous to establish that he touched her vagina, rather than the general area surrounding the vagina. We disagree. During the interview, A.C. used the terms "lower area" and "line on the lower area" and, on the diagram, circled the general area around the vagina when asked to define the "lower area." She also stated that the line on the lower area was where she urinated from. Additionally, at trial, the prosecutor showed A.C. the same diagram and asked A.C. to point to the vaginal area, which A.C. did. The jury could reasonably infer from the evidence presented that A.C. was referring to her vagina when she said, "lower area." See *People v. Hinthorn*, 2019 IL App (4th) 160818, ¶¶ 92-93 (describing vagina as "lower area" was sufficient to establish penetration of child's vagina); *People v. Lara*, 2011 IL

App (4th) 090983-B, ¶ 57 (child's reference to her "pee pee" was sufficient for a jury to conclude that the defendant's mouth was on her vagina).

¶ 40     Defendant further argues that even if the terms "lower area" and "line on the lower area" could be interpreted as referring to the vagina, A.C.'s statements were still not sufficient to establish sexual penetration of her vagina. Again, we disagree. In her interview, A.C. stated that "he tried to kind of like put his finger kind of like more into it *** like more into the lower area" and that "he actually like put his finger in a little bit." Any contact, however slight, of the sex organ is sufficient to establish penetration, and thus this evidence was sufficient for the jury to reasonably conclude that defendant penetrated A.C.'s sex organ with his fingers. Defendant's claim that the State "failed to establish the critical elements of intrusion" is accordingly refuted. We also note that to the extent that A.C.'s statements did not include a detailed description, the issue of penetration is for the trier of fact to determine and a lack of detail in the victim's testimony only affects the weight of the evidence. *People v. Raymond*, 404 Ill. App. 3d 1028, 1041 (2010). *People v. Bell*, 234 Ill. App. 3d 631, 636 (1992) ("Whether penetration occurred is a question of fact, which is to be evaluated by the jury as the trier of fact, and a lack of detail in a [witness's] testimony only affects the weight of the evidence").

¶ 41     Next, defendant argues that the State failed to prove the number of acts and the date of those acts with sufficient certainty. Our supreme court has recognized that "it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time." *People v. Bishop*, 218 Ill. 2d 232, 247 (2006). In cases involving child sexual abuse, the precise date of an offense "is not an essential factor," and the State is not required to prove it. *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005). "The inability to remember exact dates and

times merely affects the weight to be given the testimony and taken alone, does not create reasonable doubt." *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990).

¶ 42    During the interview, A.C. stated that defendant committed these acts "probably once like every other week" starting "probably" in "October-ish" of 2015. These timeframes align with A.C.'s statements that the frequency of the inappropriate touching intensified at the beginning of the school year after defendant started a new job in July 2015 that allowed him to be at home when she returned from school but before her mother returned home from work. The timeframe, as identified by A.C., was sufficiently specific, and any issues with A.C.'s credibility as to when and how often these incidents occurred was for the jury to weigh and resolve. The fact that A.C. was unable to furnish specific dates is not detrimental to the case as victims of repeated abuse are typically unable to provide such details. See *People v. Letcher*, 386 Ill. App. 3d 327, 333 (2008) (noting that a victim of repeated abuse by an individual inside the home is typically "unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assault") (Internal quotation marks omitted.).

¶ 43    Defendant further suggests that the vague nature of the evidence regarding the dates of the acts conflicted with the specific time frames included in the verdict forms. However, the verdict forms clearly limited each count to a one-month time period, which is not unreasonable or overly broad, and comported with A.C.'s statements during the interview. We presume the jury understood the separate verdict forms and the relevant time periods because they found defendant not guilty of two counts with timeframes in August and September.

¶ 44    Finally, defendant argues that the interview is not reliable because there was no evidence to corroborate A.C.'s statements and A.C. recanted her statements at trial. However, the "testimony of the victim alone is sufficient to support a conviction if the testimony is clear and convincing."

*In the Interest of C.K.M.,* 135 Ill. App. 3d 145, 150 (1985). Given the nature of the charged offense, it is not surprising to this court that there is a lack of physical or eyewitness evidence in a case such as this, where there would likely be no physical evidence of defendant inserting his finger into A.C.'s vagina and where defendant would likely commit these acts when there were no witnesses nearby. See *People v. Cookson*, 215 Ill. 2d 194, 215 (2005) (no physical evidence or third-party eyewitnesses in child sexual abuse case); *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 89 (the statutory definition of penetration does not require physical evidence). Nonetheless, defendant's own statements to the police—that one time when he was intoxicated, he woke up with his hand underneath A.C.'s underwear—corroborated to some extent A.C.'s allegations.

¶ 45    Defendant supports this argument with citations to multiple cases in which the defendant's conviction was reversed for lack of sufficient evidence. However, these cases are all distinguishable from the case now before us. In *People v. Arcos*, 282 Ill. App. 3d 870 (1996), the defendant appealed his murder conviction following a bench trial. This court reversed the conviction because the trial court, who was the trier of fact, specifically found that the eyewitness had no credibility whatsoever and the corroborative evidence was lacking. *Id.* at 876. Here, it is clear, based on the verdict, that the trier of fact—the jury—found A.C.'s initial statement to be more credible than her recantation at trial, and a determination of credibility is within the purview of the jury. Additionally, as we have stated, there was corroborative evidence here in the form of defendant's statements to the police.

¶ 46    We similarly find *People v. Parker*, 234 Ill. App. 3d 273, 280 (1992), *People v. Wise*, 205 Ill. App. 3d 1097, 1101 (1990), and *People v. McCarthy*, 102 Ill. App. 3d 519, 524 (1981), distinguishable. Although those cases involved jury trials, this court found in each case that the witnesses' statements were too inconsistent or severely impeached to find the defendant guilty

beyond a reasonable doubt where there was no corroborating evidence. Here, we have corroborating evidence, and despite A.C.'s recantation, her interview with Ayala still contains indicia of reliability such that the jury could conclude that her prior statements were truthful.

¶ 47    As previously stated, we will not reweigh the evidence presented at trial. It is the finder of fact's role to weigh the evidence and determine the credibility of the witnesses. See *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). In sum, the jury observed A.C.'s demeanor during the video-recorded interview as well as during her testimony at trial. They could have found that A.C.'s video-recorded statement was more credible than her trial testimony, especially in light of the somewhat corroborating statements defendant made to the detectives. In her interview, A.C. was specifically asked if defendant was able to put his finger even a little bit into the line of her lower area and she responded yes, and she also stated that this occurred every other week starting around "October-ish." A reasonable inference could be made that defendant's finger penetrated A.C.'s vagina based on her forensic interview. The jurors were able was able to assess A.C.'s credibility and rationally concluded, based on the evidence presented, that defendant committed acts of sexual penetration of A.C.'s vagina in the months of October, November, December, and January. Accordingly, viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence for the State to prove defendant guilty beyond a reasonable doubt of predatory criminal sexual assault and we affirm his convictions.

¶ 48                            B. Admission of Video-Recorded Statement

¶ 49    Next, defendant argues that the trial court erred in admitting the video-recorded statement of A.C. following a section 115-10 hearing. Specifically, defendant contends that A.C.'s statement did not contain sufficient indicia of reliability to satisfy the requirements of section 115-10, especially where, according to defendant, the court was not made aware of A.C.'s full recantation.

Defendant asserts that "[t]he State never disclosed to the Court or defense counsel that A.C. had recanted all her allegations against Defendant [in 2016] in either its motion or at the subsequent hearing."

¶ 50    "To preserve an issue for review, defendant must both object at trial and in a written posttrial motion." *People v. McNeal*, 405 Ill. App. 3d 647, 660 (2010). Defendant concedes that he forfeited this issue and thus requests that we review this claim for plain error.

¶ 51    The plain error doctrine permits a reviewing court to address a forfeited claim where a "clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Hood*, 2016 IL 118581, ¶ 18. The defendant bears the burden of establishing plain error. *People v. Wilmington*, 2013 IL 112938, ¶ 43. The first step, however, is to determine whether the trial court erred in admitting the statement. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 52    Prior to proceeding with our plain error analysis, we deem it appropriate to first address defendant's claim that the State was aware of A.C.'s recantation prior to the section 115-10 hearing and failed to inform the court of this fact. Defendant points to the following colloquy as evidence of the alleged nondisclosure which, when taken out of context, could be read to support his claim. At trial, A.C. testified as follows:

    "PROSECUTOR: Prior [to] today, did you ever tell the State that you had lied?

    DEFENSE COUNSEL: Objection.

    THE COURT: Overruled. She may answer.

A.C.: Yes.

PROSECUTOR: When was that?

A.C.: Like almost last year when I asked my mom if she could tell her this case could be over."

Later, Rodriguez affirmed that A.C. informed her that she had lied several times in the past year, but Rodriguez also testified that she had no contact with the prosecution or police prior to trial. The State argues that the record does not support defendant's claim of the nondisclosure and after reviewing the record, we come to the same conclusion. Because we find defendant's claim of nondisclosure as a basis to find error in admitting A.C's video-recorded interview to be unsupported by the record, we additionally find that that the alleged nondisclosure could have had no bearing on the propriety of the statement's admissibility. Thus, we do not consider this claim further except to admonish defendant that the presentation of arguments which are supported neither by the record nor evidence at trial are sanctionable and counsel is strongly advised to refrain from such conduct in the future. That said, we now turn our attention to the question concerning the admissibility of the video-recorded statement.

¶ 53    Section 115-10 allows certain hearsay statements to be admitted as evidence at trial for the purpose of alleviating concerns that "very young child witnesses often lack the cognitive skills to effectively communicate instances of abuse or might be psychologically impeded from doing so." *People v. Foster*, 2020 IL App (2d) 170683, ¶ 28. The intention behind this statutory provision is "to provide for reliable, corroborating evidence of a child's 'outcry' statement." *People v. Bowen*, 183 Ill. 2d 103, 114 (1998). Section 115-10 permits out-of-court statements made by the victim if "[t]he court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability[.]" 725 ILCS 5/115-

10(b)(1) (West 2016). Interviews conducted according to CAC protocol may qualify for admission under section 115-10. *Id.* 5/115-10 (e). To admit a hearsay statement under section 115-10, the State has the burden of establishing that the statements are reliable and "not the result of adult prompting or manipulation." *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009). The relevant factors for the court to consider include the child's spontaneous and consistent repetition of the incident, the child's mental state, the use of terminology unexpected of a child of a similar age, and the lack of motive to fabricate. *People v. Bowen*, 183 Ill. 2d 103, 120 (1998).

¶ 54 A trial court has considerable discretion in admitting hearsay statements. *People v. Sundling*, 2012 IL App (2d) 070455, ¶ 31. We review a trial court's decision as to the reliability and admissibility of a child's out-of-court statement pursuant to section 115-10 under an abuse of discretion standard.[2] *People v. Hubbard*, 264 Ill. App. 3d 188, 193 (1994). An abuse of discretion occurs when the trial court's determination is arbitrary, fanciful, or unreasonable or when no reasonable person would agree with the stance adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). Absent an abuse of discretion, we will not disturb the trial court's finding that a statement is sufficiently reliable to be admitted. *People v. Major-Flisk*, 398 Ill. App. 3d 491, 508 (2010).

¶ 55 We first assess the language A.C. used to describe the incidents. A.C. identified her "lower area" as the place where defendant touched her with his fingers, and she circled on the diagram the vaginal area to show what she meant by "lower area." She then identified the line on the diagram, representing the vagina, as the place from which she urinated, and she affirmed that

---

[2]Defendant contends that we should review the trial court's ruling *de novo* because this issue involves a statutory interpretation, though he fails to explain what interpretation is required. We are not interpreting section 115-10 but simply applying it to the facts at hand. Thus, the abuse of discretion standard is appropriate here.

defendant's finger sometimes went "a little bit" inside of the "line of the lower area." The trial court determined that the terminology A.C. used and her reticence to use more graphic details when describing the acts was expected and age-appropriate. There is nothing arbitrary nor unreasonable about that finding.

¶ 56    We also find that the timing of the statements did not indicate a lack of reliability. A child's delay in reporting sexual abuse is not uncommon, and such delay goes to the weight of the statements, rather than the admissibility under section 115-10. *People v. Jahn*, 246 Ill. App. 3d 689, 704 (1993). Further, "the failure of a young sexual assault victim to make a prompt complaint is easily understandable because of the natural sense of shame, fear, revulsion, and embarrassment felt by children under such circumstances." *People v. Priola*, 203 Ill. App. 3d 401, 414 (1990).

¶ 57    According to the interview, the inappropriate touching had been ongoing for the prior several months and the most recent incident took place a few weeks before A.C. spoke to the police and Ayala. This court has found significant outcry delays do not negate the reliability of the statements or render the statements inadmissible but rather are for the jury to assess the impact on the victim's credibility. See *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 101 (two-week delay); *Jahn*, 246 Ill. App. 3d at 704 (eight-month delay); *People v. Land*, 241 Ill. App. 3d 1066, 1081 (eight-month delay); *People v. Anderson*, 225 Ill. App. 3d 636, 649 (1992) (one-month delay). Moreover, it is not the promptness with which the statute is necessarily concerned but how the timing of the outcry affects its reliability. See *People v. Sharp*, 391 Ill. App. 3d 947, 955-56 (2009) (a delay in reporting an assault does not automatically render a victim's statements unreliable); *People v. Deavers*, 220 Ill. App. 3d 1057 (the focus should be on whether any events may occur during the time lapse that could adversely affect the reliability). A.C. told multiple friends of these incidents prior to Daniella calling the police and she stated that she was afraid to tell her mother.

There is nothing suspect about the timing of A.C.'s outcry, and the jury could assess the delay, if any, as going to the weight of her statement.

¶ 58    Nonetheless, defendant complains that the trial court made its determination without crucial evidence regarding the timing and spontaneity of A.C.'s statements, *i.e.*, what led to her outcry prior to her statement. As demonstrated above, A.C. clearly states in the interview what transpired prior to the interview, rendering defendant's argument without merit. Also without merit is defendant's argument that the court should have heard testimony from the police officers regarding the contents of Daniella's and A.C.'s statements to them on January 29. Defendant cites to no authority to support this argument, there is nothing in the record to suggest that such testimony would have changed the court's ruling, and section 115-10 does not require such testimony for the court to make its determination.

¶ 59    We also cannot say that A.C.'s responses to Ayala's questions were the result of "adult prompting." Though some of Ayala's questions could be considered leading, the intention was to get A.C. to be more specific as to what occurred when defendant touched her, and the questions were mostly open-ended. See *People v. Smith*, 152 Ill. 2d 229, 260 (the fact that a statement was made in response to a question does not destroy spontaneity). Additionally, at the beginning of the interview, Ayala and A.C. discussed the difference between the truth and a lie and A.C. promised to tell the truth. At the end of the interview, A.C. denied that anyone had told her what to say.

¶ 60    Finally, based on the record, A.C. had no apparent motive to lie and in fact, stated during the interview that defendant was "kind" to her. We acknowledge that A.C's recantation at trial may have raised questions for the jury regarding her credibility. Indeed, consistency, or lack thereof, in a victim's statements is a relevant factor in assessing their reliability. *Stechly*, 225 Ill. 2d at 313. However, a ruling to admit statements pursuant to a section 115-10 hearing is not

undermined by evidence later presented at trial; rather, the court's ruling is solely based on the section 115-10 hearing. "[T]he statute does not provide any basis for holding that evidence presented at trial may undermine the trial court's findings of reliability at the prior section 115-10 hearing." *People v. Monroe*, 366 Ill. App. 3d 1080, 1086 (2006); see also *Cookson*, 215 Ill. 2d at 205 ("While questions about the reliability of the statements may have arisen at trial, the record available at the time of the [hearing] supports the trial court's decision to admit the complainant's hearsay statements."). As such, the incongruity of the video-recorded statement and A.C.'s trial testimony affects only the weight of the evidence—an issue for the trier of fact—not the admissibility of the interview.

¶ 61    Thus, because there was nothing in the record at the time of the hearing to suggest that A.C.'s statement was anything other than reliable, we find that the trial court's decision to admit A.C.'s statement pursuant to section 115-10 was not error, much less plain error. See *People v. Brant*, 394 Ill. App. 3d 663, 677 (2009) (in the absence of error, there can be no plain error).

¶ 62                            C. Prosecutorial Remarks

¶ 63    Defendant also contends that the prosecutor's remarks during opening and closing arguments were inappropriate and prejudicial where the prosecutor falsely informed the jury that defendant had confessed to the offenses.

¶ 64    Opening and closing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). To determine whether the prosecutor's remarks constituted reversible error, the court must consider whether they resulted in substantial prejudice to the defendant, "such that without the erroneous comments the verdict would have been different." *Jackson*, 2012 IL App (1st) 092883, ¶ 42. "Improper

comments alone will not warrant reversal unless they are a material factor in convicting the defendant." *Id.*

¶ 65    Whether this issue is reviewed *de novo* or for abuse of discretion is unsettled in the courts. *People v. Raymond*, 404 Ill. App. 3d 1028, 1059 (2010). It is unnecessary for us to resolve this debate at this time, however, because our conclusion would be the same under either standard. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶¶ 76-77 (acknowledging the conflict regarding the standard of review).

¶ 66    To preserve claimed errors, a defendant must contemporaneously object at trial and in a written posttrial motion. *People v. Flax*, 255 Ill. App. 3d 103, 107 (1993). "Where a timely objection is made at trial, the trial judge can usually correct the error by sustaining the objection and instructing the jury to disregard the improper remark." *Id.* Defendant concedes that he did not preserve this claim of error, and he requests plain error review. We must first determine whether the prosecutor's remarks were in error.

¶ 67    We note that though defendant takes issue with the prosecution's opening statement in the "statement of facts" section of his brief on appeal, he does not develop the argument later in his brief. Nonetheless, we briefly address the statements he highlights from the opening argument. "The function of an opening statement is to inform the jury as to what each party expects the evidence to prove throughout the course of the trial." *People v. Rader*, 178 Ill. App. 3d 453, 461 (1988). It may outline what the prosecutor reasonably expects to prove but cannot include facts that he will not or cannot prove. *Id.* at 462. An opening statement should also be " 'brief and general' " and " 'free from material that may tend to improperly prejudice the accused in the eyes of the jury.' " *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22 (quoting *People v. Weller*, 123 Ill. App. 2d 421, 427 (1970)).

¶ 68    The challenged statements from the prosecutor's opening statement consist of the following:

> "Ladies and gentlemen, you will hear how in the beginning, the defendant was testing his limits with [A.C.]. He would touch her breasts, he would kiss her, he would touch her vaginal area. And you will hear that as time progressed the defendant became bolder and bolder. Each time touching her further. You will hear how touching her vaginal area turned into putting his finger into her vagina. You will hear how each time he touched her, he would insert his finger more and more into her vagina and this didn't happen one time, two times, three times. It happened a lot of times.

¶ 69    We find no issue with these remarks. All of these statements are supported by A.C.'s interview and are somewhat corroborated by defendant's statements to the police. For this reason, we cannot say that the prosecutor made any statements that he could not prove from the evidence presented at trial, and the defendant was not prejudiced by the prosecutor's opening argument.

¶ 70    We now turn to defendant's challenge to the State's closing argument. "Prosecutors are offered wide latitude in closing argument." *Wheeler*, 226 Ill. 2d at 123. Prosecutors are permitted to comment on the evidence presented and draw all reasonable inferences from the evidence, even if they may be unfavorable to the defendant. *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36. However, "prosecutors may not argue assumptions or facts not contained in the record. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009).

¶ 71    The challenged statements from closing argument consist of the following:

> This defendant did this to [A.C.], took advantage of her youth as a 12-year-old girl.
> So, what happened in this case with defendant when he was alone with [A.C.], this 12-

year-old girl, touched her inappropriately. He touched her breasts. He touched her vagina. He inserted his finger into her vagina.

* * *

The defendant gave a statement to the police about what happened. He gave a pretty detailed statement about what happened and circumstances around what happened; but in the end, what he told the police was that he put his finger into her vagina. Maybe he was drunk. Maybe it was an accident, but he did it; and there is no accident in putting your finger into someone's vagina and being drunk is no excuse. Think about it.

* * *

Ladies and gentlemen, we submit to you that he did commit these acts every month when [A.C.] started 6th grade, every month. You heard it from his own statement to the police that he did it. So, when you consider the verdict forms, that's why it's separating the separate time periods because he's charged for each and every separate time that he did this to her because it is a separate act. It is a separate violation of her each time he put his finger into her vagina."

¶ 72    After reviewing the entirety of the prosecutor's closing argument, we find that the majority of the comments were statements of the evidence or reasonable inferences drawn therefrom. Although she recanted at trial, A.C. stated in her interview with Ayala that defendant touched her breasts and inserted his finger into her vagina on multiple occasions. Defendant also admitted to Detective Pagels that he put his hand on A.C.'s breast and underneath her underwear, though he stated it was an accident and he might not have been able to remember exactly what happened because he was drunk. Further, it is permissible for the prosecutor to argue the implausibility of a defendant's defense. *People v. Cloutier*, 156 Ill. 2d 483, 509 (1993).

¶ 73    We acknowledge, however, that the prosecutor did inaccurately state that defendant told Detective Pagels that he put his finger inside A.C.'s vagina. In fact, Detective Pagels testified that defendant admitted to rubbing A.C.'s vagina while intoxicated but specifically denied inserting his finger. However, "a prosecutor's comments in closing argument will result in reversible error only when they engender substantial prejudice against a defendant to the extent that it is impossible to determine whether the jury's verdict was caused by the comments or the evidence." *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). We cannot say that this stray remark mischaracterizing testimony was a material factor in the jury finding defendant guilty. See *People v. Jackson*, 2020 IL 124112, ¶ 87 (finding that two isolated remarks mischaracterizing the evidence "were not so improper and so prejudicial that real justice was denied").

¶ 74    Nevertheless, defendant argues that the prosecutor stating he "did it" in combination with the misstatement of the detective's testimony resulted in the prosecutor manufacturing a confession where there was not one. There is an important distinction to be made, however, where the prosecutor states that defendant "did it" or "did this to her" and where the prosecutor states "You heard it from his own statement that he did it." The former was made clearly within the context of viewing the evidence as a whole, which supported that inference; the latter is based on the previous misstatement of the detective's testimony. This is a misleading statement but we do not believe that it marred the entirety of the closing argument as defendant has argued.

¶ 75    Additionally, the trial court's repeated instructions to the jury that closing statements are not evidence likely cured any improper or misleading remarks. See *People v. Garcia*, 231 Ill. App. 3d 460, 469 (1992) (jury instruction that arguments are not evidence tends to cure any prejudice from improper remarks); see also *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103 ("Improper arguments can be corrected by proper jury instructions, which carry more weight than the

arguments of counsel."). Thus, the two improper but isolated comments as related to the detective's testimony, coupled with the usual admonishments, is not enough to call the verdict into question. Accordingly, "[w]ithout reversible error, there can be no plain error." *Jackson*, 2020 IL 124112, ¶ 88.

¶ 76                                   D. Jury Instructions

¶ 77    Finally, defendant contends that the jury instructions contained multiple errors. Specifically, he claims that Illinois Pattern Jury Instructions, Criminal, No. 3.06-07 (approved Oct. 17, 2014) and Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI 3.06-07 and IPI 3.14) should have been submitted to the jury and IPI 26.01 was submitted to the jury in error. He contends that IPI 3.06-07 would have informed the jury of how to properly consider defendant's statement to the detectives and that IPI 3.14 would have instructed the jury that they could only consider defendant's conduct of touching A.C.'s breast for a limited purpose. As to IPI 26.01, defendant argues that the instruction was improper because he was only charged with committing the offense of predatory sexual criminal assault in one way, *i.e.*, by allegedly inserting his finger into A.C's. vagina, and the instruction provided multiple or "different ways."

¶ 78    "The purpose of jury instructions is to provide the jury with correct legal principles that apply to the evidence, thus enabling the jury to reach a proper conclusion based on the applicable law and the evidence presented in a case." *People v. Jackson*, 331 Ill. App. 3d 279, 290 (2002). It is a party's responsibility to prepare jury instructions and tender them to the trial court. *People v. Underwood*, 72 Ill. 2d 124, 129 (1978). As a general rule, the court has no obligation to instruct the jury on its own motion. *People v. Parks,* 65 Ill. 2d 132, 137 (1976)*.* In criminal cases, the general rule must give way to fair trial considerations. *Id.* In such cases*,* the court bears the burden

of ensuring the jury is instructed concerning the presumption of innocence, the elements of the offense charged, and the burden of proof. *People v. Turner*, 128 Ill. 2d 540, 562 (1989) (citing *Parks,* 65 Ill. 2d at 137).

¶ 79    "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). In addition, pursuant to Illinois Supreme Court Rule 366(b)(2)(i) (eff. Feb. 1, 1994), "[n]o party may raise on appeal the failure to give an instruction unless the party shall have tendered it." There is no dispute that defense counsel did not tender the instructions at issue here or object to any that were given. Defendant thus requests that we review his claims of instructional error under plain error review.

¶ 80    Our supreme court in *People v. Sargent*, 239 Ill. 2d 166, 191 (2010), stated:

> "The function of jury instructions is to convey to the jurors the law that applies to the facts so they can reach a correct conclusion. The erroneous omission of a jury instruction rises to the level of plain error only when the omission creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. (Internal citations omitted.) This standard is a difficult one to meet. We have noted, for example, that it is not necessarily plain error to omit the definition of a term used to instruct the jury on the essential issue in the case. Even an incorrect instruction on the element of an offense is not necessarily reversible error. (Internal citations omitted.)"

¶ 81    Of course, as before, we must first determine whether "a clear and obvious error" occurred in the trial court's instructions to the jury. *Sargent*, 239 Ill. 2d a 189-90.

¶ 82    We first address the instructions that defendant argues should have been issued to the jury: IPI 3.06-07 and IPI 3.14. In our view, the rule espoused in *Turner* is dispositive. 128 Ill. 2d at 562-63 (failure to give IPI 3.14 not error because it did not involve presumption of innocence, burdens of proof, or elements of the offense). However, in his reply brief, defendant argues, without more, that *Turner* is not controlling as "instructional error depends upon the context in each case." The rule regarding *sua sponte* jury instructions as set forth in *Turner* applies with equal force here, regardless of the differing facts. The rule in *Parks*, relied upon by *Turner,* avoids shifting the burden of advocacy from the litigants to the trial judge. Furthermore, a defendant may not sit idly by at trial and then on appeal point a finger of blame at the trial judge for that which defendant believes, in hindsight, ought to have been done. Based on *Turner*, we hold that the trial court's failure, to *sua sponte,* give either  IPI 3.14 or 3.06-07 was not error. However, even considering the particular instructions in the "context" of this particular case without regard to *Turner*, as defendant suggests, the argument would still fail.

¶ 83    As to IPI 3.14, defendant contends that the instruction would have admonished the jury that they could only consider defendant's conduct of touching A.C.'s breast for a limited purpose. He argues that this act was unrelated to the offenses before the jury and thus prejudiced defendant.

¶ 84    IPI 3.14 "provides a vehicle by which juries can be instructed on the proper manner of considering other crimes evidence" presented at trial.  *People v. Jackson*, 331 Ill. App. 3d 279, 291 (2002). Because other crimes evidence is highly prejudicial, it is generally inadmissible, except in certain limited exceptions. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (other crimes evidence is generally prohibited "to protect against the jury convicting a defendant because he or she is a bad person deserving punishment"). When other crimes evidence is offered, and unless objected to, IPI 3.14  is given to mitigate against the presumptive prejudicial effects of the

otherwise inadmissible evidence. *People v. Gordon*, 2017 IL App (2d) 140770, ¶ 32. The Committee Comments to the instruction suggest that the instruction be given by the court orally, both before the evidence is presented and again, following its presentation. IPI 3.14, Committee Note (approved Oct. 17, 2014); see also *People v. Denny*, 241 Ill. App. 3d 345, 360-61 (1993).

¶ 85 In his brief, defendant cites to specific pages in the record wherein he alleges the "other crimes evidence" was presented. Our review of the record reveals that, with the exception of Detective Pagels' testimony, the comments which defendant identifies occurred in the context of the State's opening and closing arguments. Arguments are not evidence, a fact about which the jury was instructed, twice. Moreover, defendant was not heard to object either to the State's arguments or to Detective Pagels' testimony, which largely related the substance of defendant's statements during the police investigation. Clearly, Detective Pagels' testimony, which only incidentally included a reference to defendant's statements that he touched A.C. on her breast and between her legs, was not offered for the purpose of presenting other crimes evidence. IPI 3.14 was not intended to address objectional statements made in the spontaneity of argument or testimony. To the extent that defendant found any of the identified statements improper, he had at his disposal the right to object, a trial procedure about which the trial court properly admonished the jury. Accordingly, we hold that an instruction on other crimes evidence, *sua sponte* or otherwise, was not warranted and thus, we find no error.

¶ 86 Neither can we say that there was any error in the trial court's failure to include, *sua sponte*, IPI 3.06-07. Defendant contends that IPI 3.06-07 would have informed the jury how to properly consider defendant's statement to the detectives. At trial, the State admitted evidence of statements defendant made through the testimony of Detective Pagels, who interviewed defendant.

¶ 87 IPI Criminal No. 3.06-3.07 reads:

"You have before you evidence that [(the) (a)] defendant made [a] statement[s] relating to the offense[s] charged in the [(indictment) (information) (complaint)]. It is for you to determine [whether the defendant made the statement[s], and, if so,] what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 88    At the close of the evidence, the court gave Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter IPI 1.02), to the jury, the instruction on the believability of witnesses. The instruction admonishes the jury that it is the judge of the believability of witnesses and the weight to be given their testimony. IPI Criminal, No. 1.02 (4th ed. 2000). It further instructs the jury to take into account the witnesses' bias or prejudice, and the "reasonableness of his testimony considered in light of all the evidence in the case." IPI Criminal, No. 1.02 (4th ed. 2000). By giving IPI 1.02, the trial court properly admonished the jury regarding every witness's testimony, including that of Detective Pagels, the greater substance of which relayed defendant's statements. IPI 3.06, although pointedly applicable to a defendant's statement, would have had no different effect on the jury's assessment of defendant's statements as related through Pagels', than did IPI 1.02.

¶ 89    We next address defendant's argument that IPI 26.01 was erroneously submitted to the jury. Defendant was charged with committing the same offense in the same way on different occasions. Defendant claims that the addition of the "different ways" instruction may have confused the jury. We do not share defendant's concerns.

¶ 90    As we set out in the facts, the court instructed the jury as follows:

"The defendant is charged in different ways with the offense of Predatory Criminal Sexual Assault. You will receive two forms of verdict pertaining to each particular way

- 31 -

that the offense of Predatory Criminal Sexual Assault is charged. As to each particular way the offense of Predatory Criminal Sexual Assault is charged, you will be provided with both a 'not guilty' and 'guilty' form of verdict. From these two verdict forms as to each particular way that the offense of Predatory Criminal Sexual Assault is charged, you should select the one verdict form that reflects your verdict and sign it as I have stated. Do not write on the other verdict form. Sign only one verdict form as to each particular way that the offense of Predatory Criminal Sexual Assault is charged."

The Committee Note to IPI 26.01 states that this instruction should be given when a defendant is charged with multiple counts with different elements of an offense. Defendant does not cite to any caselaw to support his argument that giving a different ways instruction when it is not implicated results in plain error. It appears to this court that the trial court issued this instruction to inform the jury that defendant was charged with multiple counts occurring on different dates.

¶ 91    Regardless, the court instructed the jury correctly as to the elements of the offense of predatory criminal sexual assault and explained the different verdict forms. Additionally, the jury's decision to find defendant guilty of four counts and not guilty of two counts demonstrates that the jury was not confused or misled as to the different ways instruction. For these reasons, we find that any error in submitting this instruction to the jury did not rise to the level of plain error.

¶ 92    We also note that defendant alludes to an argument of cumulative error due to the combined effect of these alleged instructional errors. However, defendant cites to no caselaw to support his argument. Regardless, in assessing jury instructions, the question is "whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *People v. Parker*, 223 Ill. 2d 494, 501 (2006). As we have already found, the trial court advised the jury of the presumption of innocence, burdens of proof, and elements of each offense,

along with the function of the different verdict forms and the different dates. Even if we were to consider the admission of IPI 26.01 and the omissions of IPI 3.06-07 and 3.14 as errors, they in no way "severely threaten[ed] the fairness of the trial" *Sargent*, 239 Ill. 2d at 191. Thus, defendant's claims of instructional error do not rise to the level of plain error either separately or combined.

¶ 93                                    III. CONCLUSION

¶ 94    For the reasons stated, we affirm the judgment of the circuit court.

¶ 95    Affirmed.