THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. XAVIER ARCOS, Defendant-Appellant.

First District (4th Division)    Nos. 1—93—0828, 1—93—3432 cons.

Opinion filed August 1, 1996.

Michael J. Pelletier, of State Appellate Defender's Office, and David S. Mejia, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James P. Navarre, Janet Powers Doyle, and Robert Robertson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAHILL delivered the opinion of the court:

We review a conviction for murder after a bench trial. The trial court sentenced the defendant to 55 years in prison. The defendant appealed. We granted a petition for bond pending appeal and the State appealed that order. The supreme court denied the State's petition to revoke bond.

The issue we face is whether the evidence was sufficient to find the defendant guilty beyond a reasonable doubt. That evidence consisted of a written statement and the grand jury testimony of an eyewitness to a murder admitted as substantive evidence under section 115—10.1 of the Illinois Code of Criminal Procedure of 1963. 725 ILCS 5/115—10.1 (West 1992). No issue is raised about the admissibility of the statement and grand jury testimony as substantive evidence under the statute.

The witness, Wilfred Rosario, disavowed his written statement and grand jury testimony at trial.

At the close of evidence the trial court found that, though Rosario was a "thoroughly disreputable person who cannot be believed," his written statement and grand jury testimony were more credible than his disavowal at trial.

Rosario's written statement and grand jury testimony named the defendant as a participant in the crime with Rudy Martinez. In accepting the written statement and grand jury testimony of Rosario, and rejecting the disavowal, the trial court relied upon additional evidence characterized by the State and the court as corrobative of the

written statement and grand jury testimony. Our review of the alleged corroborative evidence relied upon by the trial court leads us to the opposite conclusion. We reverse.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). We defer to the observations and credibility findings of the fact finder. Our relevant inquiry is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 48, 538 N.E.2d 453 (1989). As we follow these principles of review and carefully comb the record, should we find the evidence insufficient to remove all reasonable doubt of the defendant's guilt and not sufficient to create an abiding conviction of his guilt, we must reverse. *Young*, 128 Ill. 2d at 48. Our reversal in this case is based upon a finding that the evidence relied upon by the trial court to corroborate the testimony of Wilfred Rosario failed to support the identification of the defendant as a participant in the crime.

The record before us reveals that Chicago police detective Eveland responded to a radio dispatch and found a dead man in an alley on north Spaulding Avenue in Chicago on July 29, 1988. The dead man was identified as Orlando Guirola. He had been shot seven times. The initial investigation revealed no eyewitnesses.

Dr. Shaku Teas, a forensic scientist in the office of the Cook County medical examiner, performed an autopsy on Guirola the next day. Dr. Teas concluded that the seven gunshot wounds caused Guirola's death. His report also disclosed ligature wounds around the neck.

Chicago police detective Renaldo Guevara testified that on January 26, 1991—approximately $2^1/2$ years after Guirola's death—he received a telephone call from Edith Campos. She complained of a domestic dispute with Wilfred Rosario. Guevara went to the Campos home.

When Guevara arrived, Campos told him that Rosario had hit her and pointed a gun at her. Guevara arrested Rosario and took him to Area Five headquarters. Guevara asked Rosario about some murder investigations Guevara was working on. He said Rosario told him about a crime in 1988 in which two persons shot a man somewhere around Grand and Spaulding in Chicago. Guevara was unfamiliar with the circumstances of the crime and called Area Four headquarters for assistance.

Guevara told officers at Area Four about his discussions with Ro-

sario. Detective James Capesius responded to Guevara's call and interviewed Rosario. Rosario subsequently signed a statement implicating Xavier Arcos in the murder of Guirola and confirmed that statement before a grand jury.

Detective Capesius testified that on February 25, 1991, a month after Rosario made his statement, he arrested Xavier Arcos for the murder of Guirola. Capesius gave Arcos *Miranda* warnings and questioned him. Arcos admitted that he knew Rudy Martinez. He admitted that he had visited Martinez at the Metropolitan Correctional Center and that a beeper and wallet in Arcos's possession when he was arrested belonged to Martinez.

Rosario's statement of January 26, 1991, and grand jury testimony confirming it, were admitted into evidence at Arcos's trial under section 115—10.1 of the Illinois Code of Criminal Procedure. 725 ILCS 5/115—10.1 (West 1992).

Rosario related in his statement that, on the night of Guirola's death, Rosario and others were in a parking lot next to a building at 3300 Division, where a party was in progress. A light colored car driven by Rudy Martinez arrived. Arcos was in the back seat, and a third man, later identified as Guirola, was in the passenger seat.

Rosario said Martinez and Arcos called him and two other men over to the car and asked where they could dump Guirola. At that point Guirola stirred and Arcos began to strangle him from the back seat. Rosario walked away. He heard Joseph Morero—one of the men who had gone with him to the car—tell Martinez to dump Guirola in "snake alley."

The car then left. Rosario and another man with him in the parking lot—Ismael Rivera—decided to observe what Martinez and Arcos would do. They went through a gangway and saw the car drive by. Martinez was hitting Guirola and Arcos was strangling him. Rosario and Rivera then ran through another gangway and saw the car stop in an alley. Rosario then saw Martinez display a gun and shoot Guirola four times. He handed the gun to Arcos, who shot the victim three times. Rosario and Rivera returned to the party. Later, Martinez and Arcos appeared at the party, talked to Morero, and left.

Rosario later testified before a grand jury. He said that his statement was true, given voluntarily, and bore his signature.

Rosario disavowed his statement and grand jury testimony at trial. He said he had made the statement while under the influence of narcotics, that he had feared for his life, and had wanted to avoid incarceration with gang members who wanted to kill him. He said the color of the car, the identity of the occupants, and other details of the crime had been furnished to him by the police. He said he had

signed the statement and testified before the grand jury as part of a deal with the State.

Ismael Rivera, named in Rosario's statement as an eyewitness to the murder, was arrested on February 15, 1992. The police confronted him with Rosario's statement. After *Miranda* warnings, Rivera made a statement. An assistant State's Attorney reduced it to writing and Rivera signed it. The statement corroborated Rosario's account of the crime, except that he was unable to identify the man in the back seat of the car Rosario had identified as Arcos. According to Rivera, the man who participated in the crime with Martinez wore a hood.

Maria Rodriguez testified. She said that around 5 p.m. on the day of the murder—about six hours before it happened—she was at her home with the victim. A man she knew as "Stretch" drove up in a car. Martinez was in the front passenger seat and a man wearing glasses was in a back seat. Martinez got out of the car and asked Guirola to go with him. Guirola and Martinez returned to the car and the men drove away.

Rodriguez saw Martinez and Arcos at a funeral the next day. Martinez approached her and said, "You have not seen me at all, you have not seen me picking anybody up." Rodriguez then identified Arcos in open court as the man wearing glasses and seated in the back of the car driven by "Stretch" on the day of the murder.

Under cross-examination Martinez said that he did not know Arcos, had never seen him before July 29, 1988, but learned his name sometime after the murder.

Detective Guevara testified that he never threatened Rosario and never told him to make up facts about the murder. He stated he did not notice anything about Rosario when Rosario made his statement that would lead him to believe Rosario was under the influence of drugs.

At the close of the case, the trial court found the defendant guilty of first-degree murder. He noted that Arcos was identified by Maria Rodriguez and Rosario. He stated that he believed Detective Guevara told the truth and that the police did not feed Rosario information. He noted that Rosario's statement, if believed, was sufficient to convict.

The trial court also said that Rosario had absolutely no credibility. However, the trial court found that Rosario's statement to the police was true. The court said it believed Rosario would say anything to get the police to drop the charges against him, whether it was true or untrue, but that it would have been easier to tell the police something he already knew rather than make something up.

The trial court then said that Rosario's statement was further

bolstered by clear and convincing corroborative evidence. It noted that Maria Rodriguez's testimony, Rivera's testimony, Arcos's possession when he was arrested of a beeper and wallet belonging to the coperpetrator Martinez, and the autopsy report, were consistent with Rosario's account of the shooting.

The defendant first argues on appeal that when the State's case is based upon a prior inconsistent statement disavowed at trial, and the defense alleges that the statement was obtained through duress, prompting or coercion, then—absent physical evidence linking defendant to the crime or corroboration—the disavowed statement is insufficient, as a matter of law, to convict. The defense mainly relies upon *People v. Parker*, 234 Ill. App. 3d 273, 600 N.E.2d 529 (1992), for this proposition.

■ The *Parker* court held that when "the only evidence that inculpated the defendant was prior inconsistent statements which were directly contradicted by the alleged declarents at trial, the credibility of this evidence was greatly reduced." *Parker*, 234 Ill. App. 3d at 280. However suspiciously the *Parker* court viewed disavowed section 115—10.1 statements in the case before it, we do not read the opinion as rejecting those statements as a matter of law when disavowed. In *People v. Bailey*, 265 Ill. App. 3d 262, 638 N.E.2d 192 (1994), we rejected the argument that a section 115—10.1 statement standing alone is insufficient to convict when later disavowed at trial. *Bailey*, 265 Ill. App. 3d at 277. As the trial court noted in the case before us, it is for the trier of fact to weigh the statement, weigh the disavowal, and determine which is to be believed. Accord *People v. McBounds*, 182 Ill. App. 3d 1002, 536 N.E.2d 1225 (1989).

While we reject the defense argument, we recognize that the trial court here clearly rejected Rosario as a credible witness. The court then, as we read its findings, relied upon independent corroborative evidence to find that Rosario's statement was more believable than his disavowal at trial. What the trial court did not make clear in its ruling is whether it relied upon the corroborative evidence to enhance the credibility of Rosario's statement as a generally accurate recounting of the crime—or whether it found the evidence corroborated an essential element of the State's case—the identity of Arcos as a participant in the murder.

■ What amounts to corrobative evidence varies depending upon the facts to be corroborated. *In re C.C.*, 224 Ill. App. 3d 207, 214, 586 N.E.2d 498 (1991); *In re Brunken*, 139 Ill. App. 3d 232, 240, 487 N.E.2d 397 (1985). Corroborative evidence by its nature makes it more probable than not that a fact to be corroborated is true. *In re B.W.*, 216 Ill. App. 3d 410, 416, 576 N.E.2d 346 (1991). It must be relevant, and

relevant evidence is that which has a tendency to make the existence of any fact more probable than it would be without it. *People v. Monroe*, 66 Ill. 2d 317, 322, 362 N.E.2d 295 (1977).

■ Having first rejected Rosario as a witness who could not be believed, we conclude that the trial court must have looked to the corroborative evidence to support the essential elements of the State's case, including the identity of Arcos as a participant in the murder.

That corroboration is wanting. The trial court referred to four corroborative elements. Maria Rodriguez identified the defendant in a car. But this happened more than six hours before the murder took place. Rivera agreed with Rosario's general account of the murder. But Rivera could not identify the defendant. The defendant was arrested with the wallet and beeper of a man who participated in the crime. But this was $2^1/2$ years after the crime was committed. The autopsy report corroborated Rosario's account of how the murder happened. But it sheds no light on who committed it.

Should we find the evidence insufficient to remove all reasonable doubt of defendant's guilt and not sufficient to create an abiding conviction of his guilt, we must reverse. *Young*, 128 Ill. 2d at 48. We so find.

Our ruling makes it unnecessary to address the remaining issues raised by the defendant.

Reversed.

HOFFMAN, P.J., and O'BRIEN, J., concur.