2024 IL App (1st) 210992-U

SECOND DIVISION
June 4, 2024

No. 1-21-0992

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 17 CR 14886/02 |
| | ) | |
| ALBERT ROBINSON, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court did not abuse its discretion in denying mistrial after witness testified inconsistently from pretrial statements. Defendant was not prejudiced by counsel's failure to request continuance.

¶ 2    Albert Robinson, defendant here, and Perry Coleman were charged with first-degree murder for the shooting of Edward Mason Sr. (Coleman is not a party to this appeal.) During the trial, the victim's son, Edward Mason Jr., testified inconsistently to what he had told investigators and a grand jury before trial. The younger Mason, clearly distraught over his father's death and upset he had to testify, professed he could not remember details he previously could, claimed he was "mentally gone" and suffering from various mental illnesses, stated that

he was intoxicated when he first spoke to investigators, and even tried to leave the witness stand at one point.

¶ 3     Defendant moved for a mistrial after Mason Jr. tried to walk off the stand, alleging that the State did not tell him Mason Jr. was going to change his story and claiming the State violated discovery rules when it did not disclose Mason Jr.'s new testimony. The court denied the motion, concluding that nothing Mason Jr. said was exculpatory or so egregious that the trial had to be halted. After the trial, which included a video of defendant confessing to the shooting, a jury found him guilty of first-degree murder.

¶ 4     He appeals, claiming the court should have granted him a mistrial, or alternatively, that his counsel was ineffective for not requesting a continuance to investigate Mason Jr.'s claims. But Mason Jr.'s performance on the stand was not so surprising that it warranted a mistrial, nor is there any evidence the State withheld anything from the defendant. Finally, any mistakes counsel might have made did not prejudice defendant. We affirm.

¶ 5                              BACKGROUND

¶ 6     We take the facts from defendant's pretrial motion to suppress his confession and the evidence presented at trial. Because the issues defendant raises involve Mason Jr.'s testimony at trial—compared to what he told investigators and the grand jury—we focus our attention there.

¶ 7     The evidence at trial generally established that Robinson and defendant shot Mason Sr. the morning of June 4, 2017, after an argument. Mason Sr. had left a large gathering of people in the 1800 block of West Maypole Avenue after the initial fight, but when he returned, the argument resumed until Robinson, and then defendant, shot him multiple times. He died on the scene.

¶ 8     The State charged defendant and Coleman with multiple counts of first-degree murder. A

joint but severed jury trial was held, and the jurors found defendant guilty of first-degree murder and found that he had personally discharged a firearm causing Mason Sr.'s death.

¶ 9                                  I. Defendant's Confession to Police

¶ 10    After the shooting, police began to zero in on defendant and Robinson as the possible shooters. Investigators arrested and interviewed defendant on July 11, 2017, about a month after the murder. That interview was recorded on video.  Part of the video of that interview was played for the jury, and a transcript of that interview was entered into evidence.

¶ 11    While defendant initially denied any involvement, he eventually admitted he had helped shoot Mason Sr. Defendant said that, before the shooting, he had sold Mason Sr. two bags of crack cocaine. Robinson was present when the sale took place. At that point, one of the victim's friends—who was only referred to as "Lex"—pulled a gun and started an argument with Robinson and defendant. During the argument, Robinson gave defendant a gun, and the group eventually told Lex that he was banned from the area for starting the fight. Mason Sr. and Lex then left.

¶ 12    But Mason Sr. returned a short while later, presumably to buy more drugs, defendant told investigators. When he came back, Robinson and defendant were worried that Mason Sr. had a gun, since Lex had the gun moments earlier. After another brief argument, Robinson then pulled out a gun and shot Mason Sr. seven or eight times. After the first shot, Mason Sr. grabbed his side and said something to the effect of "you shot me, cuz." Then, defendant said, he joined in and shot Mason Sr. another four or five times, indicating he fired down toward the victim's lower torso and thighs. When police asked him what caliber of gun he used, defendant said "Uh, I don't know what type it is, .25 or something like that." When the shooting was over, defendant got into a car and left the area.

¶ 13    Defendant also told investigators that, a few days after the shooting, his aunt set up a meeting at a pizzeria with Mason Jr. Defendant's aunt wanted to keep the peace between them, but when Mason Jr. arrived, he told defendant that he was going down for the rest of his life.

¶ 14    Defendant moved to suppress the statement and confession before trial on the grounds that police coerced him into confessing by violating his right to an attorney when he asked for one. The trial court rejected the challenge, concluding that while defendant did invoke his right to speak to an attorney at one point of the interview, he eventually re-engaged police and waved them back into the room after they began to leave. The court found no coercion and ruled the statement admissible at trial. The State later entered the video into evidence and played a portion of the interview for the jury. (The suppression ruling is not at issue on appeal.)

¶ 15                        II. Mason Jr.'s Pretrial Statements

¶ 16    Edward Mason Jr., the victim's son, was also key to the investigation into his father's death. Mason Jr. was on the scene when police arrived and began their investigation, but Detective Robert Graves said Mason Jr. was too emotional to speak at first. Graves did not believe Mason was intoxicated or otherwise inebriated when he first tried to speak with him. Mason Jr. later calmed down and was able to help police; Detective Nicholas Evangelides showed Mason Jr. a series of photo arrays a few days after the incident, and Mason Jr. identified defendant and Robinson as the shooters.

¶ 17    On June 16, 2017, Detective Dale Potter interviewed Mason Jr. about what he saw when his father was shot. That interview, held at the police station at 51st and Wentworth streets in Chicago, was video recorded. Mason Jr. told Potter that, on June 4, 2017, at around 2 a.m., a large group of people were hanging out in an alleyway in the 1800 block of West Maypole Avenue. Co-defendant (Mason Jr's uncle) and defendant (Mason Jr.'s cousin) were part of the

group, as was Mason Sr.

¶ 18    Before the shooting, an argument broke out between Robinson and a man named Bernard. Mason Jr. did not know what started the argument, but he tried to stop it by stepping in between the men and telling Bernard and Mason Sr. to leave. Bernard and the elder Mason did, and Mason Jr. said he did not see Bernard or his father threaten Robinson, nor did he or his father have a gun at the time of the argument.

¶ 19    Mason Jr. told Potter that, after some time, Mason Sr. returned to the area. When he was walking toward the group, Robinson pulled out a firearm and walked up to Mason Sr. Robinson lifted up Mason Sr.'s shirt and began to ask "where the gun at?" When Robinson was satisfied Mason Sr. did not have a gun, Robinson shot him multiple times in the torso. Mason Sr. began to fall to the ground, and Robinson shot him twice more, Mason Jr. said. Defendant ran past Mason Jr., he said, and then also began shooting at Mason Sr. In total, Mason Jr. believed Robinson and defendant shot his father between 15 and 20 times.

¶ 20    At the end of the interview, Mason Jr. said he had been treated well by investigators, given food, allowed to use the restroom if he wanted, and was not promised anything or threatened in any way. He said he was not under the influence of any drugs or alcohol and had given his statement freely and voluntarily. At trial, Potter said that Mason Jr. did not appear to be under the influence of any drugs at the time, and Potter said he had no reason to think Mason Jr. was suffering from any kind of mental illness when he was interviewed.

¶ 21    About a week later, the State called Mason Jr. to testify before a grand jury. Mason Jr.'s testimony was largely in sync with what he told Detective Potter: on the morning of June 4, 2017, there had been an argument involving Robinson, defendant, and Mason Sr., and Mason Sr. left. When he returned, Robinson and defendant shot and killed him. The assistant state's

attorney who questioned Mason Jr. testified at trial that there was no indication Mason Jr. was intoxicated or under the influence of any substances, nor that he had any problems remembering what happened.

¶ 22    For reasons that will become apparent, portions of Mason Jr.'s video interview and his grand jury testimony were offered as evidence at defendant's trial.

¶ 23                              III. Mason Jr.'s Trial Testimony

¶ 24    At defendant's trial, Mason Jr.'s took a decidedly different turn. Now in front of the jury judging defendant's culpability, Mason Jr. testified he could not remember a lot of the details he previously could, suggested he was intoxicated when the shooting happened, and claimed he suffered from various mental illnesses throughout the whole time, including when he testified. Nor could he remember basic information about the defendants standing trial.

¶ 25    For example, at trial, Mason Jr. was asked whether he knew defendant, Albert Robinson, who sometimes went by "Donny." Despite the fact that defendant was Mason Jr.'s cousin, defendant testified only that the name "sounds familiar." When asked whether he was related to defendant, Mason Jr. answered, "I probably don't know them by their name." The State then asked even more directly, using defendant's given first name (Albert) and his nickname, "Donny":

> "Q:    Do you have a cousin named Albert Robinson?
>
> A:    No, I don't remember that.
>
> Q:    Do you have a cousin named Donny?
>
> A:    No, I ain't got no cousin named Donny."

¶ 26    Mason Jr. likewise testified that co-defendant's name sounded familiar but he could not recall who he was, despite the fact that co-defendant was his uncle.

¶ 27    When asked what he remembered before seeing his father get shot, Mason Jr. said things like he saw "a lot of demons and hell. That's all I remember, hell, demons everywhere" and that he "wasn't even mentally alive. I was dead in my mind." He frequently complained that he was shaky and nervous, that he did not remember anything, did not remember speaking to police a few days after the murder, seeing photo arrays, or giving an interview. When confronted with the photo arrays and his signature, he sometimes claimed he made a mistake. Numerous times, he testified that he was under the influence of various drugs when he spoke with investigators or claimed he was insane.

¶ 28    Sometimes, Mason Jr. would agree to a leading question put to him, only to contradict or backtrack a moment later. At one point, he stood up and told the court "You all going to have to lock me up, man, I'm not finna do this [expletive], man." The trial court had sheriff's deputies take Mason into custody and dismissed the jury for lunch.

¶ 29    After the jury left the room, defendant moved for a mistrial. Counsel explained:

> "With due respect to the State, this morning we had the conference dealing with the fact that this witness wasn't showing up. I've been to too many trials not to realize that this witness was giving them trouble, and I was somewhat surprised that he was the first witness they called.
>
> We, as for Mr. Robinson, were never made aware that he was going to make contrary statements, whatever. I would ask, and perhaps my motion is premature, but this seems like he was telling him this before … what I'm saying essentially is that we were never tendered what seems to be exculpatory statements by this witness during, in fact, [the State's] preparation of this, which is a violation of discovery rules."

¶ 30    Counsel further argued that it appeared Mason looked afraid because he was threatened,

and that defendant was "stuck with a witness who's refusing to testify." The State did not respond to defendant's motion before the court denied it. In its ruling, the trial court said that Mason's testimony was "not exculpatory" but rather was "an individual coming in here who is obviously hesitant, recalcitrant." In the court's eyes, Mason was trying to get out of testifying by being generally uncooperative, and the court considered the testimony inconsistent but not the kind of evidence that the State had a duty to disclose to the defendant before trial.

¶ 31     Mason Jr. took the stand again after the lunch break but remained difficult. He was shown a video in which a Chicago police detective interviewed him a few days after the crime, but continually said that he did not remember the interview or answering questions during it. When the prosecutor confronted him with his testimony in front of the grand jury, he again feigned ignorance or denied saying things to the grand jurors.

¶ 32     On cross-examination, defendant questioned Mason Jr. extensively about his purported mental illnesses, his frequent use of drugs and alcohol, and his emotional state at the time of the shooting. Mason Jr. admitted that he was "delusional" because he was going through a divorce at the time his father was shot. He also admitted he was receiving mental health medications while in custody at the jail, but counsel was not allowed to ask him for a specific diagnosis—the court sustained a hearsay objection to that question. However, counsel was eventually able to elicit that Mason Jr. was seeing a doctor for schizophrenia, and that he was on medication for that condition.

¶ 33     Following Mason Jr.'s testimony, the State called Detective Potter to the stand to explain his interview with Mason Jr. After the requisite foundation had been laid, the State played a portion of that interview for the jury where Mason Jr. explained what happened—specifically, that Coleman and defendant shot his father. The State then called assistant State's Attorney

Michael Pekara to testify. Pekara had questioned Mason Jr. before the grand jury and testified that Mason Jr. did not appear to be intoxicated or otherwise under the influence of any substance when he testified. Pekara then read a portion of a transcript of Mason's grand jury testimony to the jurors.

¶ 34    Corarina Mason, the victim's mother and Mason Jr.'s grandmother, testified that she was living in Minnesota at the time of her son's death but came to Chicago after he died. While there, she spoke to her grandson. Mason Jr. told her that Coleman and defendant had shot Mason Sr. The younger Mason did not appear to be under the influence of drugs or alcohol when they spoke.

¶ 35    An autopsy determined that Mason Sr. had been shot approximately 20 times, with wounds in his head, chest, arms, and legs. Dr. Stephanie Powers, a licensed medical examiner, testified that several of the shots on their own would have been fatal, and that she had recovered various projectiles from the body. Seven of the recovered bullets were sent to the Illinois State Police crime laboratory, where Marc Pomerance determined that they were .22 caliber and all fired from the same firearm.

¶ 36    Defendant offered no evidence in his case, and after closing arguments, the jury found defendant guilty of first-degree murder and that he had personally discharged a firearm causing death. The court sentenced defendant to 40 years in prison. This appeal followed.

¶ 37                                ANALYSIS

¶ 38    On appeal, defendant focuses on the trial testimony of Mason Jr. He claims that Mason Jr. surprised him when he testified inconsistently with his previous statements to investigators and the grand jury. When defendant moved for a mistrial, the court denied his motion, then later curtailed his ability to question Mason Jr. on his specific medical diagnosis. Denying him a

mistrial, defendant argues, was an abuse of discretion and warrants a new trial. Alternatively, he alleges his trial counsel was ineffective for failing to seek a continuance to investigate Mason Jr.'s mental health claims once he made them.

¶ 39     We start with the motion for a mistrial. The State claims that defendant has forfeited this argument because the argument he raises on appeal is broader than the one he raised at trial. To preserve an error for appeal, a party must raise the issue before the trial court and renew the claim in a post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). A general objection is typically not enough to preserve an issue for review, as objections should specify the offending testimony or issue and identify the grounds for protest. *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 34.

¶ 40     The State argues that defendant's objection that the State did not turn over potentially exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83 (1963), was not sufficiently specific. In the State's eyes, any argument otherwise—which includes the bulk of defendant's argument on appeal—is forfeited. See *People v. Jackson*, 2022 IL 127256, ¶ 15.

¶ 41     The State's forfeiture argument is not without merit. At trial, counsel for the defense argued that the defense was unprepared for Mason Jr.'s surprise testimony and suggested that the State had an obligation to provide advance notice of it under *Brady*. In his post-trial motion, defendant wrote "[t]he court erred in not granting [the] motion for mistrial" and elaborated as follows: "Before the presentation of evidence, the prosecution had a conference with the defense dealing with the issue of the absence of the witness. During this conversation no member of the defense team was made aware that Mr. Mason was going to alter his 'story' in any way *** [or] [c]laim mental difficulties or intoxication at the time of the incident. As such the defense stood unprepared for the testimony as given." The principal focus in each objection, during and post-

trial, was on the *Brady* violation.

¶ 42    Still, we think defendant did enough in terms of specificity to preserve the issue for appellate review. While some specificity is required, the aggrieved party need only identify specific issues to give the trial court an opportunity to correct the alleged error. *People v. Hope*, 184 Ill. 2d 39, 45 (1998). Defendant's motion for mistrial, as well as his claim in his post-trial motion, included the claims he now asks us to review. We choose to consider it.

¶ 43    A court should grant a mistrial when an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuing the proceedings would defeat the ends of justice. *People v. Nelson*, 235 Ill. 2d 386, 435 (2009). We will not reverse the court's denial of a mistrial absent an abuse of discretion. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). A court abuses its discretion when its decision is arbitrary or unreasonable. *People v. Patrick*, 233 Ill 2d 62, 68 (2009).

¶ 44    We should start with the obvious fact, ignored by defendant, that Mason Jr.'s "surprise" testimony was by no means harmful to defendant. The witness went from affirmatively identifying defendant as the shooter to claiming to have no idea who defendant (his cousin) was and no idea who shot his father. There are certainly worse "surprises" for a defendant to experience. Perhaps, with the opportunity to pursue the matter further, defendant could have made even more with this new testimony, but we must begin with the fact that Mason Jr.'s testimony in no way injured defendant.

¶ 45    In any event, we take defendant's point as this: In convicting defendant even after Mason Jr. disavowed his pretrial statements and testimony implicating him, the jury must not have believed his recantation and instead credited his pretrial statements to the police and grand jury. If defendant had been given the opportunity to start the trial over and get hold of Mason Jr.'s

mental-health records, the argument goes, and if those records established that Mason Jr. was, in fact, suffering from mental illness at the time of the shooting so debilitating that he did not remember his father's shooting or could not reasonably account for it, the jury might have believed his recantation at trial and rejected his pretrial statements. And that, of course, would have all but erased Mason Jr.'s testimony from the trial.

¶ 46    There is some speculation in that theory. We cannot say for certain what the jury was thinking. Nor can we know what Mason Jr.'s mental-health records would have revealed. But we know enough to confidently say that the denial of the mistrial did not defeat the ends of justice or deny him a fair trial.

¶ 47    The key here is the substance of Mason Jr's trial testimony. He did not exonerate defendant. He did not testify, for example, that he witnessed the shooting, but defendant was *not* the shooter. At most, if believed, Mason Jr.'s trial testimony removed him from the story altogether—he did not see the shooting, he does not remember it, he was intoxicated and delusional. In defendant's best-case scenario—again we speculate, but in his dream scenario— defendant would have started the trial over, this time armed with mental-health records establishing that Mason Jr. was suffering from some form of acute mental illness so debilitating that his account of the shooting must be entirely discarded.

¶ 48    But the jury easily could have convicted defendant absent Mason Jr.'s testimony. For one, defendant confessed his guilt to the police, undoubtedly powerful evidence. See *People v. Simpson*, 2015 IL 116512, ¶ 36; *People v. Dorsey*, 2023 IL App (1st) 200304, ¶ 119. And that confession was corroborated by forensic evidence. Seven of the bullets recovered from Mason Sr.'s body were fired from a .22 caliber gun. Although defendant said he had used a ".25 or something like that," he admitted the bullets were "small." It would not be unreasonable for the

jury to believe that the .22 bullets found in Mason Sr.'s body came from defendant's gun—especially since defendant admitted shooting the victim.

¶ 49    So Mason, Jr.'s recantation does not have the gravitas defendant assigns it. Even if we credited defendant's theory as far as it could possibly go, speculating along the way, it would not be enough to show a denial of fundamental fairness.

¶ 50    For that reason, we likewise reject defendant's alternative argument that his attorney provided ineffective assistance of counsel in failing to seek a continuance to obtain Mason Jr.'s mental-health records. To demonstrate ineffective assistance, defendant must show *both* that counsel provided deficient performance *and* that defendant suffered prejudice—that there is a reasonable likelihood that the outcome of the proceedings would have been different absent the allegedly unprofessional error. *Strickland v. Washington*, 466 U.S. 668, 667 (1984).

¶ 51    As we have just explained, we find no reasonable likelihood that defendant would have been acquitted even had Mason Jr.'s account of the shooting been totally discredited. Because defendant cannot show prejudice, we need not consider the issue of deficient performance. *Id.*; *People v. White*, 2011 IL App (1st) 092852, ¶ 76. We reject the *Strickland* argument.

¶ 52                              CONCLUSION

¶ 53    The judgment of the circuit court is affirmed.

¶ 54    Affirmed.