2024 IL App (1st) 1210755-U

SECOND DIVISION
September 24, 2024

No. 1-21-0755

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 14886 |
| | ) | |
| PERRY COLEMAN, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirmed. Evidence was sufficient to convict defendant of first-degree murder. Trial court did not err in omitting fourth *Zehr* principle as defense counsel requested. Counsel was not ineffective for declining to call witness.

¶ 2    A jury convicted defendant Perry Coleman of first-degree murder for participating in the shooting of Edward Mason Sr., alongside codefendant Albert Robinson. A separate jury, sitting simultaneously, convicted Robinson of being the second shooter. We have affirmed Robinson's conviction, and he is not a party to this appeal. *People v. Robinson*, 2024 IL App (1st) 210992-U.

¶ 3    Defendant raises three appellate issues. He argues that the evidence was insufficient; that the trial court did not comply with Illinois Supreme Court Rule 431(b) when it questioned the prospective jurors; and that his trial counsel was ineffective for failing to call a known witness

who could have "impeached" the State's key eyewitness. We disagree and affirm.

¶ 4                                    BACKGROUND

¶ 5     The victim, Edward Mason Sr., was shot around 2:00 a.m. on June 4, 2017, amid a large gathering of people on the 1800 block of West Maypole Avenue in Chicago. A single eyewitness identified defendant as the shooter, or more precisely, as one of two shooters. That man was Edward Mason Jr., the victim's son and defendant's nephew.

¶ 6     Mason Jr. implicated defendant in a number of pretrial statements that he later recanted at trial. For the first time at trial, he claimed that he suffered from a host of mental maladies at the time of the shooting and when he made his pre-trial statements: he was drunk; he was hallucinating on PCP; he was mentally anguished and "delusional," on account of a difficult divorce; and he was suffering from PTSD, schizophrenia, and possibly other mental illnesses that were only recently diagnosed.

¶ 7     After Mason Jr. recanted his prior statements, those statements were admitted into evidence, some as substantive evidence, others for impeachment. We begin with Mason Jr.'s substantive evidence: his recorded stationhouse interview and his grand-jury testimony.

¶ 8                                        I

¶ 9     Detective Robert Graves spoke to Mason Jr. (and his then-wife) when the police arrived at the scene of the shooting. Graves did not believe that Mason Jr. was in any way intoxicated. But he was visibly distraught, for obvious reasons, and too emotional to speak at first. He later calmed down and gave the police his contact information. In the weeks to come, he would assist the police with their investigation, and prove to be the key—indeed, the only—eyewitness.

¶ 10    About two weeks after the shooting, Detective Nicholas Evangelides showed Mason Jr. a series of photo arrays. Mason Jr. identified defendant and codefendant Robinson as the men who

shot his father. That same day, Detective Dale Potter interviewed Mason Jr. about the shooting. The stationhouse interview was video recorded, and relevant portions were published to the jury.

¶ 11    Mason Jr. said that a large group of people were hanging out in the alleyway. Defendant (Mason Jr.'s uncle) and codefendant (Mason Jr.'s cousin) were part of the group, as was Mason Sr., Kenyale Phillips (Mason Jr.'s cousin and defendant's son), a man named Bernard, and one named Ricardo Hargrove, perhaps among others.

¶ 12    Before the shooting, an aggressive argument broke out between defendant and Bernard. Mason Jr. did not know what started the argument, but he tried to stop it by stepping in between the men and telling them to "leave it alone, it's not that bad." Bernard and Mason Sr. walked off, and Mason Jr. did not see Bernard or his father threaten defendant. Neither Mason had a gun.

¶ 13    Defendant then started arguing with Mason Jr., telling him that he should not have done what he did because he "could get somebody hurt like that." When Phillips defended Mason Jr., defendant (that is, Phillips's father) got mad at Phillips and started physically fighting with him. Mason Jr. tried to break up that fight, too, to no avail. The fight between defendant and his son only abated when Mason Sr. came back to the area.

¶ 14    Defendant turned his attention to Mason Sr. as he approached. Defendant pulled a semi-automatic handgun from his front waistband, walked up to Mason Sr., lifted up Mason Sr.'s shirt, and asked him, "where the gun at?" When defendant was satisfied that Mason Sr. did not have a gun, he shot Mason Sr. in the torso. He continued to shoot as Mason Sr. fell to the ground, at which point codefendant walked up and joined in the shooting. All told, they shot Mason Sr. about 15 to 20 times.

¶ 15    Before the shooting, Mason Sr. did not hit, push, or do anything to suggest that he wanted to hurt defendant. Mason Jr. estimated that he was about 20 to 30 feet away from the shooting

and noted that the streetlights were on, giving him a clear view of the events and participants.

¶ 16    At the end of the interview, Mason Jr. said he was treated well by investigators, was given food and allowed to use the restroom if he wanted, and was not promised anything or threatened in any way. He said he was not under the influence of any drugs or alcohol and had given his statement freely and voluntarily. At trial, Potter testified that Mason Jr. did not appear to be under the influence of any drugs at the time, and Potter found no reason to think that Mason Jr. was suffering from any kind of mental illness when he was interviewed.

¶ 17    About a week after the stationhouse interview, Mason Jr. testified before a grand jury. Relevant portions of his grand-jury testimony were published to defendant's jury. Because that testimony was consistent, in all essentials, with Mason Jr.'s statements during the interview, we will not belabor the details of his account.

¶ 18    Mason Jr. acknowledged to the grand jury that he had said the same things during his interview with the police, and to Assistant State's Attorney (ASA) Michael Pekara, who spoke to Mason Jr. before presenting him to the grand jury. Mason Jr. recognized and acknowledged the photo arrays from which he had identified defendant. He affirmed that he was speaking freely and voluntarily, and that he was not under the influence of any drugs or alcohol.

¶ 19    ASA Pekara testified at trial that Mason Jr. was able to provide detailed information about the shooting when they spoke at the courthouse before his grand-jury testimony. Mason Jr. did not appear to be under the influence of drugs or alcohol, nor did he indicate that he suffered from any mental illness that made it difficult for him to communicate about what he witnessed.

¶ 20                                             II

¶ 21    Mason Jr.'s testimony at trial took a decidedly different turn. For one, he was clearly distraught over his father's death and repeatedly objected to being "reminded" of these tragic

events by virtue of having to testify. And his hostility toward the State was evident from the start. He only begrudgingly acknowledged that he had two pending criminal cases, both drug-possession charges fronted by the State on direct examination, and he complained that the State was making it difficult for him to maintain his employment.

¶ 22     Mason Jr. went so far as to claim that he did not recognize and thus could not identify defendant in the courtroom, even though, as he acknowledged, defendant was his uncle. As for codefendant, Mason Jr. claimed, in so many words, that he had no idea who he was, even though codefendant was his cousin. Mason Jr. had previously told the grand jury that he saw both these relatives frequently.

¶ 23     Mason Jr. repeatedly complained that he was shaky and nervous, and more importantly, he denied that he had any clear memory of the shooting, despite his detailed prior accounts. For example, when he was asked what he remembered before seeing his father get shot, he said, "a lot of demons and hell. That's all I remember, hell, demons everywhere," adding that he "wasn't even mentally alive. I was dead in my mind." And that is just one characteristic statement of many that Mason Jr. made on the witness stand.

¶ 24     Mason Jr. claimed that he did not remember speaking to the police a few days after the murder, viewing photo arrays, giving a stationhouse interview, or testifying before a grand jury. When confronted with the photo arrays and his signature, for instance, he acknowledged that he "probably" signed it, "but it wasn't with honesty," since he "was real lost" at the time.

¶ 25     Mason Jr. offered a host of explanations for this sudden about-face. He was "under heavy influence" of alcohol and hallucinating on PCP at the time of the shooting. He was "delusional" at the time because he was going through a difficult divorce. He suffered from various mental illnesses, including PTSD, and "sometimes" schizophrenia.

¶ 26    Mason Jr. would occasionally agree to a leading question put to him, only to contradict or backtrack a moment later. When his videotaped statement was played, he stood up, tried to leave the courtroom, and told the court, "You all going to have to lock me up, man, I'm not finna do this [expletive], man." The trial court had sheriff's deputies take Mason Jr. into custody and dismissed the jury for lunch.

¶ 27    After the recess, Mason Jr.'s testimony continued in much the same vein. He claimed that he did not recall telling his grandmother, the day after the shooting, that defendant was one of the shooters. (Or that codefendant was the other.) He did not recall leaving any items behind at the scene of the shooting, though he acknowledged that a red and black gym shoe found there did "look[ ] like" one of his. Mason Jr.'s Illinois state identification card and FOID card were inside that shoe when the police found it.

¶ 28    The State called Mason Jr.'s grandmother, Corarina Mason. Her testimony was admitted for impeachment (but not substantive) purposes. Corarina came to Chicago, from her home in Minneapolis, the day after the shooting, upon learning that her son was killed. She spoke to Mason Jr., who told her that defendant (and codefendant) were the shooters. Mason Jr. also recounted some of the details of the shooting—for example, that defendant walked up to Mason Sr., lifted his shirt, and asked where his gun was. It did not appear to Corarina that her grandson was under the influence of alcohol or drugs or suffering from any mental health issues. The parties later stipulated that, according to the detective who interviewed Corarina, she did not say, at the time, that Mason Jr. conveyed these details of the shooting to her.

¶ 29                                    III

¶ 30    The forensic evidence generally corroborated the picture that Mason Jr. painted in his pre-trial statements: his father was shot about 20 times by two different shooters. But none of the

forensic evidence directly implicated defendant in the shooting or otherwise shed light on the identity of the shooters.

¶ 31    The police recovered a .380 caliber handgun, but it was almost certainly not one of the two murder weapons, as it did not match any of the fired bullets or casings recovered from the victim's body or the crime scene. The medical examiner recovered seven fired bullets, all .22 caliber, from the roughly twenty gunshot wounds sustained by Mason Sr. The police recovered ten fired cartridge cases from the crime scene, all .40 caliber. The State's firearms expert testified that neither a .22 nor a .40 caliber bullet could be fired from a .380 caliber gun. There were no usable latent prints on the gun, but there was a DNA profile that matched a pair of identical twins named Martel and Terrell Robinson. For what it's worth, they are codefendant's brothers.

¶ 32                                      IV

¶ 33    The defense did not call any witnesses. After he was admonished of his right to testify, defendant confirmed not only that he did not want to testify, but also that he did not want trial counsel to call any other witnesses on his behalf. After he was convicted, however, defendant retained private counsel to litigate a motion for new trial.

¶ 34    Among other claims, the motion alleged that trial counsel was ineffective for failing to call Kenyale Phillips—defendant's son and Mason Jr.'s cousin—who submitted an affidavit in support of the motion. Phillips attested, in short, that Mason Jr. was with him, down the block, when they heard gunshots—the implication being that Mason Jr. did not see the shooting and so could not identify defendant as one of the shooters.

¶ 35    The trial court held an evidentiary hearing at which Phillips and trial counsel, assistant public defender (APD) Bernard Okitipi, testified. We will detail their testimony in due course, when we turn to defendant's ineffectiveness claim. Suffice it to say, for now, that the trial court

denied the motion and sentenced defendant to 40 years in prison.

¶ 36                               ANALYSIS

¶ 37                                    I

¶ 38    Defendant first challenges the sufficiency of the evidence. His argument, in sum, goes like this: Mason Jr.'s pre-trial identification statements to the police and grand jury were the only evidence that directly implicated defendant as one of the shooters. (Defendant does not challenge their admission as substantive evidence.) These statements were not corroborated, at least not on the key issue of identity, by any other witnesses or by any physical evidence. And Mason Jr. later recanted them at trial. Thus, defendant says, they are too suspect to support a finding of guilt beyond a reasonable doubt.

¶ 39    If defendant's sufficiency challenge is to succeed, he must show that the evidence was so "unreasonable, improbable, or unsatisfactory" that no rational trier of fact, viewing it in the light most favorable to the State, could accept it as proof beyond a reasonable doubt. *People v. Ross* 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's findings regarding the credibility of witnesses and the inferences to be drawn from the evidence are not conclusive, but they are entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 40    To begin, let's leave Mason Jr.'s recantation aside, for the time being, and assess his pre-trial identification statements on their own merits. It is well established that a single eyewitness identification, if positive and credible, is sufficient to sustain a conviction. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). And an identification is significantly "strengthened by the witness's prior acquaintance with the accused." *People v. Davila*, 2022 IL App (1st) 190882, ¶ 38.

¶ 41    Mason Jr. did not purport to identify a perfect stranger, or even, say, someone he had seen around the neighborhood from time to time; he identified his own uncle, a close relative

whom, by his own account, he saw frequently. (Though he refused to use the word "uncle" on the witness stand, insisting for whatever reason on calling defendant his "mother's brother.") That fact alone goes a long way toward establishing the reliability of his identification. And we would add that, though the shooting occurred at 2:00 a.m., Mason Jr. said that the streetlights were on, and he had a clear view of the shooting from some 10 yards away. He identified defendant soon after the shooting, never expressed any doubt about who and what he saw, and never wavered in his various pre-trial statements.

¶ 42    That will suffice, for our purposes here, as a brief analysis of the reliability of Mason Jr.'s identification under the so-called *Slim/Biggers* factors. See *Slim*, 127 Ill. 2d 302; *Neil v. Biggers*, 409 U.S. 188 (1972). Defendant does not argue that the *Slim/Biggers* factors were not satisfied here—as if to say, implausibly, that Mason Jr. could not reliably identify his uncle from a short distance under good lighting. Rather, he challenges the *veracity* of Mason Jr.'s pre-trial statements: as Mason Jr. later claimed at trial, he was not in his right mind, for various reasons, and thus his statements to the police and grand jury cannot be seen as anything but confabulation.

¶ 43    So let's take stock of the pertinent features and circumstances of the pre-trial statements before moving on to the recantation testimony. True, Mason Jr. was shocked and grief-stricken by what he saw. But he collected himself soon enough and cooperated with the investigation. His statements to the police and the grand jury were clear, lucid, and detailed. Though there was no corroborating evidence on the key issue of identity, the forensic evidence did support the general narrative arc of Mason Jr.'s story: his father was shot roughly 20 times by two different shooters. (And there is little doubt that Mason Jr. was there, as the police found one of his shoes at the scene, with his FOID and state ID cards tucked inside.) Mason Jr.'s pre-trial statements were

consistent with each other, rarely diverging even on finer points of detail.

¶ 44    Mason Jr. affirmed on both occasions that he was not under the influence of drugs or alcohol when making his statements. Neither the detective who interviewed him nor the ASA who presented him to the grand jury—nor, for that matter, his own grandmother, who spoke to him the day after the shooting—had any inkling that he was experiencing a mental illness or other altered mental state. Defendant points to nothing on the videotape of his police interview that plausibly suggests a different conclusion. And defendant never claimed, in any of his pre-trial statements, that he was suffering from any such maladies when he witnessed the shooting.

¶ 45    In short, his recantation aside, we have been given no reason to doubt that Mason Jr. reliably and credibly identified his uncle as one of the shooters. His pre-trial statements, while uncorroborated on the issue of identity, were nonetheless strong evidence on that issue; indeed, if he had not recanted, a sufficiency challenge based on the merits of his identification would be all but frivolous. So the question becomes: did Mason Jr.'s recantation render his prior statements so wanting that no reasonable juror could find guilt beyond a reasonable doubt? Our answer is no.

¶ 46    As we have emphasized, a strong enough identification does not require corroboration to sustain a conviction. *Slim*, 127 Ill. 2d at 307. Defendant appears to suggest that a recantation at trial automatically triggers a need for corroborating evidence. Not so. When, as here, "a jury has convicted a defendant on the basis of a recanted prior inconsistent statement, the question for the reviewing court is not whether any evidence existed to corroborate that statement," but rather, as always, whether a rational juror could have found the elements beyond a reasonable doubt. *People v. Green*, 2017 IL App (1st) 152513, ¶ 102.

¶ 47    Recanted prior statements, if properly admitted for their substance, are not a "suspect categor[y]" and "should be treated no differently" than any other type of evidence; the trier of

fact should put the statements into the mix and weigh it all together. *People v. Craig*, 334 Ill. App. 3d 426, 439 (2002). That includes the recantation testimony itself: "[I]t is for the trier of fact to weigh the statement, weigh the disavowal and determine which is to be believed." *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 27; see also *People v. Heller*, 2017 IL App (4th) 140658 ¶ 35. In other words, when presented with a recantation, the trier of fact is called upon to judge the credibility of a witness's live testimony and resolve a conflict in the evidence. That all lies squarely within the heartland of the jury's function, with all the deference that entails.

¶ 48    It follows from the general principles we have discussed that a recanted, substantively admitted prior identification statement *may* itself be sufficient evidence to support a conviction. And we have thus upheld several convictions that were based largely on such statements. See, *e.g.*, *Heller*, 2017 IL App (4th) 140658, ¶ 103; *Armstrong*, 2013 IL App (3d) 110388, ¶ 18; *People v. Thomas*, 354 Ill. App. 3d 868, 877-88 (2004); *Craig*, 334 Ill. App. 3d at 440. Much ink is spilled in the briefs on disputes about the extent of the corroborating evidence offered in these cases. Because there is no *per se* rule that an identification requires corroborating evidence if the witness recants, those disputes are beside the point, and we can safely leave them aside.

¶ 49    When, as here, the State does not present significant corroborating evidence, the sufficiency inquiry will turn on the inherent strength of the pre-trial identification statement(s) and the credibility of the recantation testimony. Mason Jr.'s identification of defendant was inherently strong, for the reasons we have discussed. So we turn now to his recantation.

¶ 50    It is perhaps a gross understatement to say that a reasonable juror could find Mason Jr.'s recantation at trial to be contrived and incredible. It could thus find that his pre-trial statements remained worthy of belief.

¶ 51    For starters, Mason Jr. was palpably hostile to the State. He did not want to recount, and

thus to some extent relive, the undoubtedly horrific experience of watching his relatives murder his father. He was angry that the State had charged him with two drug-possession cases in the wake of the murder and an apparently difficult divorce—cases that, he claimed, were making it difficult for him to stay employed. From the very start of his testimony, Mason Jr. made no secret of his motives to stonewall the State.

¶ 52     And stonewall the State he did. He repeatedly claimed that he had no useable memories of the murder. None. And he didn't want to talk about it anymore. Confronted with his lucid and detailed pre-trial statements, he tried everything he could think of to disavow them. At one point, he even got up and tried to leave the courtroom, in a fit of expletives, and had to be taken into custody by the sheriff's deputies.

¶ 53     To be sure, it *is* possible to credibly disavow or recant a prior statement, but one might rightly expect a compelling explanation of how and why the purportedly false statement came about. The jury did not have to buy the stories that Mason Jr. tried to sell, as he lurched from one explanation to the next. He was drunk at the time of the murder. He was high on PCP. He suffered from mental illnesses that he only recently learned about. Like PTSD—and not only now, but back then, too. He was schizophrenic, at least "sometimes." And he was nothing short of "delusional"—not upset or disappointed or under serious stress, but fully "delusional"—on account of his divorce. For some or maybe all these reasons, he was "hallucinating," his mind filled with nothing but visions of "demons and hell."

¶ 54     But the jury was shown incontrovertible evidence that shortly after the fact, Mason Jr.'s mind was filled with a credibly detailed description of the murder that cohered with the physical evidence. Because his police interview was videotaped, the jury could compare his demeanor when he made that statement with his cantankerous demeanor on the stand. That lends even

further weight to its credibility determination. *Armstrong*, 2013 IL App (3d) 110388, ¶ 28.

¶ 55    Lastly, Mason Jr. undermined the credibility of his recantation with displays of recalcitrance that were sometimes over the top. Storming out of the courtroom was one. And there were at least two more: he went so far as to claim that he did not recognize his uncle and professed ignorance of his cousin, too, even as they sat right there at the defense table. The jury reasonably could, and most likely did, take this as clear evidence that Mason Jr. was being deliberately uncooperative and untruthful—not to the police and grand jury, but here and now, on the witness stand.

¶ 56    In sum, a reasonable juror could find (1) that Mason Jr.'s identification was reliable and credible enough to prove defendant guilty beyond a reasonable doubt, and (2) that Mason Jr.'s recantation at trial was contrived and thoroughly lacking in credibility. Defendant's sufficiency challenge thus fails.

¶ 57    Defendant's cited cases do not convince us otherwise. In particular, they do not establish that a recanted identification is *per se* insufficient without corroborating evidence. Rather, they illustrate the obvious point that *some* recanted identifications will fall short of proof beyond a reasonable doubt in the absence of corroborating evidence, and for all sorts of fact-specific reasons: the identification was weak to begin with, the recantation was supported by credible reasons, or the defense presented its own exculpatory evidence.

¶ 58    In *People v. Brown*, 303 Ill. App. 3d 949, 965 (1999), the identification was not made until two years after the murder, and the recanting witness explained at trial that he belatedly identified the defendant only after he was led to believe that he would be charged with his own (unrelated) offense if he did not cooperate.

¶ 59    In *People v. Wise*, 205 Ill. App. 3d 1097, 1098-1101 (1990), the witness disavowed a

prior statement implicating the defendant, but the witness's pre-trial statements as a whole were riddled with contradictions: some implicated the defendant, but others exonerated him. Thus, the witness's prior statements were shown to be inherently untrustworthy.

¶ 60    In *People v. Arcos*, 282 Ill. App. 3d 870, 874 (1996), a bench trial, the trial court found that the recanting witness "had absolutely no credibility" and "would say anything to get the police to drop the charges against him, whether it was true or untrue." Yet the trial court also found that the recanted statement, made to the police, was somehow trustworthy. *Id.* In light of the trial court's own credibility finding, corroboration of the recanted statement was needed, but the appellate court found that there was none to be had. *Id.*

¶ 61    In *People v. Parker*, 234 Ill. App. 3d 273 (1992), three witnesses recanted. One was a victim who purportedly identified the defendant shortly after he was shot in the neck and while he was laid up in the hospital, in "great pain," with "tubes all over [his] body," and recovering from surgery. *Id.* at 276. Another was a juvenile, a 17-year old who had just been released from JDOC and was scared that he would be charged—because the police threatened as much—if he didn't sign the statement they prepared. *Id.* at 276-77. The third witness testified that he signed a prepared statement after he was beaten by the police. *Id.* at 277-78. And the defense, for its part, offered multiple eyewitnesses who testified that the defendant was *not* the shooter. *Id.*

¶ 62    None of these fact-specific reasons for demanding corroboration of a recanted statement apply here, where Mason Jr.'s pre-trial identification statements were reliable and credible, and his recantation testimony at trial was anything but. The State's evidence was sufficient.

¶ 63                                        II

¶ 64    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to ask all prospective jurors whether they understand and accept certain fundamental principles of law,

commonly known as the "*Zehr* principles." See *People v. Zehr*, 103 Ill. 2d 477 (1984).

Defendant argues that the trial court committed first-prong plain error by failing to question the prospective jurors in accordance with this rule.

¶ 65    In particular, says defendant, the trial court did not ask the prospective jurors whether they understood and accepted the last of the four principles set forth in the rule—namely, "that if the defendant does not testify it cannot be held against him or her." Ill. Sup. Ct. R. 431(b) (eff. July 1, 2012). The rule further provides, "however, [that] no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." *Id.*

¶ 66    And here, defendant objected—or at least specifically requested that the inquiry not be made. Twice, in fact. At the start of jury selection, the trial court asked, "Is the Defense asking that the fourth [*Zehr*] question be asked?" Counsel answered, "No, Judge." A selected juror was later removed for cause after revealing previously undisclosed reasons why he could not be fair and impartial. When a new alternate was picked, the trial court asked the prospective jurors whether they understood and accepted the first three principles and then asked defense counsel, "Do you wish the additional question asked?" As before, counsel answered, "No, Judge."

¶ 67    Rule 431(b) puts the decision to inquire about the fourth *Zehr* principle in the hands of the defense. The trial court ascertained the defense's position and honored it. That was not error.

¶ 68                                        III

¶ 69    Lastly, defendant argues, as he did in his motion for new trial, that his trial counsel was ineffective for failing to call his son, Kenyale Phillips, to "impeach" Mason Jr.'s (recanted) pre-trial identification statements.

¶ 70    Because the trial court held an evidentiary hearing on the post-trial claim of ineffective assistance, we apply a bifurcated standard of review: we review the trial court's findings of fact

and credibility determinations for manifest error, but we review the ultimate legal question of trial counsel's ineffectiveness *de novo*. *People v. Bailey*, 375 Ill. App. 3d 1055, 1059 (2007). In so doing, we apply the familiar deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Domagala*, 2013 IL 113688, ¶ 36.

¶ 71    At the evidentiary hearing, Phillips testified for the defense. APD Okitipi, defendant's lead trial attorney, testified for the State. (Due to COVID-19 concerns, he appeared via Zoom, without objection from the defense.) The hearing established three salient points.

¶ 72    First, there is no dispute that Okitipi interviewed Phillips and considered him a potential witness. Whether to call Phillips was a game-day decision, in counsel's view, to be made after seeing how the State's case actually unfolded at trial. To this end, counsel asked Phillips to come to court but excluded him from the courtroom during the first day of testimony. After Mason Jr. recanted, counsel made the final decision not to call Phillips.

¶ 73    In other words, counsel's alleged deficiency was not a failure to investigate a potential defense. To the contrary, it is undisputed that counsel made a considered, strategic decision not to call a known witness. (We will circle back to counsel's rationale for this decision shortly.)

¶ 74    Second, Okitipi and Phillips gave competing accounts of exactly what Phillips said his testimony would be. According to Phillips, he told counsel that he was hanging out in the alley with Mason Jr., smoking and drinking. They were halfway down the block and both drunk. They heard gunshots nearby, and hid behind a nearby building for a few minutes, before returning to the alley and finding Mason Sr., who had been shot, laying on the ground. The clear implication was that Mason Jr. did not see the shooting. Phillips further testified that he never got into an argument with defendant, as Mason Jr. claimed in his pre-trial statements.

¶ 75    But according to Okitipi, Phillips never told him that he was with Mason Jr., or that they were not present, at the time Mason Sr. was shot. Rather, Phillips said that before the shooting, "there was an argument between Mason Junior and Kenyale Phillips, and [defendant] was kind of a peacemaker and told him to leave the scene before the shooting." After defendant broke up the argument between Phillips and Mason Jr., Phillips went home and "Mason Junior also walked away." But Okitipi did not recall Phillips saying that they left together. Nor did he recall Phillips saying where he was when the shots were fired, or even anything about hearing or seeing the shooting at all.

¶ 76    Thus, as APD Okitipi understood it, Phillips's testimony was limited to the events that took place before the shooting. It did not clearly contradict Mason Jr.'s pre-trial claims that he saw the shooting and could thus identify the shooters. If counsel had called Philips, it would have been to establish that defendant acted as a peacemaker at the scene of the shooting; that defendant was not aggressive toward Mason Sr.; that the argument was between Phillips and Mason Jr.; and that defendant was not armed, at least as far as Phillips knew.

¶ 77    The trial court found Okitipi credible and "believe[d]" his account of Phillips's proposed testimony. The trial court thus found that Phillips's testimony would not have established that Mason Jr. was with Phillips at the time of the shooting. So it would not have undercut Mason Jr.'s claim to be an eyewitness or, in turn, his identification of defendant.

¶ 78    This credibility finding in Okitipi's favor is entitled to substantial deference, and indeed, defendant does not ask us to overturn it as manifest error. Thus, as defendant acknowledges, our *Strickland* analysis starts from the premise that Phillips would have testified at trial consistent with Okitipi's understanding of that testimony.

¶ 79     Third, Okitipi testified that he decided not to call Phillips because Mason Jr., "the State's only witness[,] recanted," and so Okitipi "believe[d] from [his] experience that [he] created reasonable doubt." In other words, Phillips's testimony had little probative value to begin with, and appeared even less useful after Mason Jr.'s recantation.

¶ 80     Against this factual backdrop, we turn to the *Strickland* analysis. When, as here, counsel makes a "strategic choice" as to whether "to present a particular witness," and the decision is informed by an adequate investigation, it "generally *** cannot support a claim of ineffective assistance of counsel." *People v. Richardson*, 189 Ill. 2d 401, 414 (2000).

¶ 81     That said, it is of course possible, albeit quite rare, for a "strategic" decision to be deemed objectively unreasonable, one which no competent defense attorney would make. The trial court and the State have marshalled various reasons why counsel acted reasonably here, and some of these points are well taken. But we may resolve a claim of ineffective assistance on the lack of prejudice alone, without deciding whether counsel's performance was reasonable or deficient. *People v. Jackson*, 2020 IL 124112, ¶ 91; *Strickland*, 466 U.S. at 697. We will do so here.

¶ 82     We share the assessment of trial counsel, the State, and the trial court that Phillips's proposed testimony, as Okitipi understood it, had little if any probative or exculpatory value for the defense. For one, Phillips could not claim to exonerate defendant by credibly identifying a different shooter.

¶ 83     And more to the point, Phillips's testimony did not even squarely contradict Mason Jr.'s pre-trial claims that he witnessed the shooting and could identify the shooter(s). We reiterate that the trial court specifically credited Okitipi's testimony that, as far as he could remember, Phillips never said that Mason Jr. was with him, somewhere down the block, where he could not possibly identify the shooters, at the time of the shooting. The upshot of what Phillips told Okitipi, in the

trial court's summation, was "only that *Mr. Phillips* wasn't there" when Mason Sr. was shot, because he had started walking home at defendant's urging after the fight. As for Mason Jr., he too "walked away" from the fight, but Phillips could not clearly account for Mason Jr.'s whereabouts when Mason Sr. was shot.

¶ 84    Thus, from counsel's perspective, all that Phillips could offer was a competing account of the fight that *preceded* the shooting: Phillips was fighting with Mason Jr., rather than defendant, as Mason Jr. claimed. By painting defendant as an unarmed peacemaker, rather than the bellicose figure that Mason Jr. described, Phillips's testimony—if believed by the jury—would extricate defendant from the preceding fisticuffs. But not from the shooting that ensued.

¶ 85    So even with Phillips's testimony, Mason Jr.'s pre-trial identification statements would have stood uncontradicted. As we explained above, those statements were clear, lucid, detailed, consistent with each other, and contemporaneous to the shooting. Nobody, including Mason Jr.'s own grandmother, had any inkling that he was mentally disturbed, beyond the understandable grief that followed his father's murder.

¶ 86    The jury evidently credited Mason Jr.'s statements to the police and the grand jury. We see no reason why the proposed testimony from defendant's son would have changed the jury's bottom-line assessment of those statements. Counsel's decision not to call Phillips does not undermine our confidence in the verdict or give rise to a reasonable probability of an acquittal. See *Strickland*, 466 U.S. at 694. Defendant has thus failed to establish prejudice, dooming his ineffectiveness claim.

¶ 87                                    CONCLUSION

¶ 88    The judgment of the circuit court is affirmed.

¶ 89    Affirmed.